The STATE of Ohio, Appellee,

v.

JONES, Appellant.

[Cite as *State v. Jones* (1996), 112 Ohio App.3d 206.]

Court of Appeals, Ohio,
Second District, Montgomery County.

No. 15397.

Decided June 28, 1996.

*Mathias H. Heck, Jr.,* Montgomery County Prosecuting Attorney, and *Anne M. Hollenkamp,* Assistant Prosecuting Attorney, for appellee.

*John H. Rion,* for appellant.

WOLFF, Judge.

After the trial court overruled his motion to suppress evidence, Donald L. Jones was found guilty by a jury of aggravated trafficking in cocaine. He was sentenced accordingly and appeals from his conviction.

The state's evidence presented at the hearing on Jones's motion to suppress established the following.

On June 30, 1994, Dayton Police Detectives Kevin Bollinger, Oliver Logan, and Thomas Lubonovic were assigned to the drug interdiction unit at the Dayton International Airport. As a part of his duties, Bollinger monitored certain incoming flights for passenger reservations appearing to fit the drug courier profile. USAir Flight 614, the only direct flight from Los Angeles to Dayton, is one of the incoming flights monitored daily. Bollinger testified that the flight is popular with drug traffickers because it departs from Los Angeles late at night and arrives in Dayton early in the morning. Additionally, the Drug Enforcement Administration considers Los Angeles to be one of four major drug source cities to the Midwest.

In reviewing the manifest for USAir Flight 614, Bollinger noticed a suspicious reservation for a "Robert James." The testimony eventually established that the appellant, Donald Jones, was traveling under the assumed name Robert James. Bollinger's attention was drawn to the reservation because it had been made the day before departure, the ticket had been purchased the day of departure, the individual had paid full fare, $743, for a one and one-half day round trip, and the ultimate destination was Cleveland. Because Jones's procedure in purchasing the ticket and his itinerary were characteristic of an individual transporting narcotics, Bollinger advised Detectives Logan and Lubonovic that they should investigate Jones further.

Logan and Lubonovic waited at the gate where passengers from USAir Flight 614 were scheduled to transfer to a flight to Cleveland. After Jones checked in under the name Robert James, he was directed to another gate, gate 17, because he had missed the connecting flight to Cleveland. Logan and Lubonovic followed Jones and, upon reaching gate 17, casually approached him from the side.

Logan displayed his badge, identified himself as a police officer, and introduced Lubonovic. Logan then asked Jones if he and Lubonovic could speak with him. Jones agreed and Logan asked to see his airline ticket and some identification. Jones offered his ticket but said that he was not carrying any identification. Logan asked Jones his name, and Jones replied that it was Robert James and gave a social security number, a date of birth, and his address in California. Both detectives examined the ticket and handed it back to Jones. When asked if he was going to Cleveland on business or pleasure, Jones stated that he was going to visit his Uncle James, but was unable to give his uncle's last name, address, or telephone number. Jones told the detectives that he was going to Cleveland to "get his life together."

After advising Jones that he and Lubonovic were narcotics detectives, Logan asked Jones if he would consent to a search of his carryon bag. Jones consented, but the bag was not searched until later in the airport security office. No contraband was found in the bag.

Logan then asked Jones if he was carrying any narcotics on his person. Jones replied that he was not and immediately reached into his pants pockets and pulled out loose dollar bills, some of which fell on the floor. At that point, Logan noticed that Jones appeared to be wearing boots. Logan testified that he asked Jones to raise his pantlegs because on a number of other occasions individuals had attempted to transport contraband by taping it above or carrying it inside their boots. Logan testified that Jones lifted his pantlegs "somewhat" and released them very quickly. Logan asked Jones to raise his pantlegs again, but this time a little higher. According to Logan, Jones quickly repeated what he had done the first time, as if he was trying to hide something. Logan testified

that until that point Jones had been very cooperative. The second or third time Jones raised his pantlegs, Logan saw that Jones was wearing shoes, not boots, and that there was brown tape wrapped around his ankle. On the other side of Jones, Lubonovic observed that Jones's pantleg was tightening up on something. Logan reached down and grabbed Jones's right pantleg to raise it even higher and saw a bundle taped to Jones's ankle. At the same time, Lubonovic reached down, touched Jones's left ankle, and felt a large package.

The detectives placed Jones under arrest and escorted him back to the airport security office. At the security office, another detective, Detective Rockwell, removed the packages from Jones's legs and opened them. The substance in the packages was determined to be cocaine. Jones told the detectives that he was transporting the cocaine to Cleveland for his uncle.

The detectives testified that they spoke to Jones in normal, conversational tones throughout the encounter. According to Logan, he was standing on the right side of Jones for most of the encounter, while Lubonovic was on Jones's left. Neither detective was standing in front of Jones, or blocking his path. Neither detective was carrying a weapon. Bollinger, who videotaped the encounter, was approximately thirty feet away. Logan and Lubonovic testified that the entire encounter, from the time they initially made contact with Jones until they arrested him, lasted approximately three to five minutes.

Jones was indicted on one count of aggravated trafficking in cocaine, in violation of R.C. 2925.03(A)(9). Jones entered a plea of not guilty and filed a motion to suppress the evidence seized during the search of his person and any statements made by him after his arrest. After conducting a hearing on September 29 and 30, 1994, the trial court overruled Jones's motion. Jones did not testify at the suppression hearing. At trial, a jury found Jones guilty as charged. The trial court sentenced Jones to a term of fifteen years to life, with fifteen years of actual incarceration, and suspended his driver's license for five years.

Jones asserts one assignment of error on appeal:

"The evidence should have been suppressed because the appellant was 'seized' absent a reasonable suspicion of criminal activity, and because he was searched absent a warrant and absent probable cause."

Jones contends that at some point before the detectives searched him, he was unlawfully seized within the meaning of the Fourth Amendment to the United States Constitution. Jones also argues that the detectives arrested and searched him absent probable cause. Consequently, Jones asserts that the trial court erred in overruling his motion to suppress.

Jones concedes that not every encounter between a citizen and a law enforcement official implicates the Fourth Amendment guarantees against unreasonable searches and seizures. *United States v. Mendenhall* (1979), 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497, 508. For example, it is well settled that Fourth Amendment scrutiny is not triggered where a police officer approaches a person in a public place, asks to talk to him, receives permission to do so, and then poses questions to him. *Florida v. Bostick* (1990), 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398; *Florida v. Royer* (1982), 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–1324, 75 L.Ed.2d 229, 235–236. The Fourth Amendment is not implicated because the person is not required to answer any of the officer's questions and is free to walk away. *Id.* at 498, 103 S.Ct. at 1324, 75 L.Ed.2d at 236–237. Such encounters between the police and citizens are considered consensual encounters and do not involve any coercion or restraint of liberty. The mere fact that the person asking the questions is a law enforcement official, and identifies himself as such, does not elevate an otherwise consensual encounter into a seizure requiring some level of objective justification. *Id.* at 497, 103 S.Ct. at 1323–1324, 75 L.Ed.2d at 235–236; *Mendenhall, supra,* 446 U.S. at 555, 100 S.Ct. at 1877–1878, 64 L.Ed.2d at 509–510. Nor does an officer's request to examine a person's identification or for consent to search a person's luggage render the encounter nonconsensual, if the officer does not convey a message that compliance with his request is required. *Immigration & Naturalization Serv. v. Delgado* (1983), 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247, 255; *Royer, supra,* at 501, 103 S.Ct. at 1326, 75 L.Ed.2d at 238–239.

Once a police officer has restrained a person's liberty by either physical force or a show of authority the guarantees of the Fourth Amendment are implicated. *Mendenhall,* 446 U.S. at 553, 100 S.Ct. at 1876, 64 L.Ed.2d at 508–509. A person is seized within the contemplation of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. In *Mendenhall,* the Supreme Court enunciated the following factors to consider in determining whether a seizure has occurred: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. Absent some evidence that one or more of these circumstances is present, police officers' contact with a citizen cannot, as a matter of law, amount to a seizure of that person. *Id.* at 555, 100 S.Ct. at 1877–1878, 64 L.Ed.2d at 509–510.

In its decision overruling Jones's motion to suppress, the trial court concluded that Logan and Lubonovic had not coerced Jones or prevented him from leaving, and that the evidence did not indicate that a reasonable person in Jones's position would have been afraid to end the interview and leave. While the trial court did not explicitly conclude that the encounter was consensual until the detectives searched Jones, that conclusion is implicit in the trial court's finding that under the circumstances a reasonable person would have believed that he was free to end the encounter and go on his way.

■ It is undisputed that only two detectives approached Jones on a public concourse, being careful to stay on either side of him so as to not block his path. Logan identified himself and Lubonovic and asked in a normal, conversational tone to speak with Jones. Jones agreed to talk to the detectives. Neither Logan nor Lubonovic displayed a weapon and, in fact, neither detective was carrying a weapon at the time. The detectives asked to see Jones's airline ticket and identification and requested consent to search his carryon bag. At the time they requested consent to search Jones's carryon bag, they had already returned his airline ticket to him. Jones consented to the search of the bag. When asked if he would raise his pantlegs, Jones voluntarily did so two or three times. Moreover, the contact between the detectives and Jones was brief, lasting only three to five minutes before Jones was arrested. Based upon the factors set forth in *Mendenhall, supra,* there is no evidence that Jones had been restrained or coerced in any way or that a reasonable person in Jones's position would not have felt free to leave. Therefore, we conclude that the evidence here supports the trial court's determination that Jones was not seized within the meaning of the Fourth Amendment prior to the detectives' search of him.

Jones relies upon *Mendenhall, Royer,* and *Bostick, State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498, and *State v. Robinette* (1995), 73 Ohio St.3d 650, 653 N.E.2d 695, for the proposition that the encounter here cannot be deemed consensual because the detectives did not expressly inform Jones that he was free to leave. Based upon our review of the cases, we are unpersuaded by Jones's contention.

*Mendenhall* and *Royer,* like this case, dealt with airport drug interdiction efforts. In *Mendenhall,* the defendant had allegedly consented to a search of her person and purse, and in *Royer,* the defendant had allegedly consented to a search of his luggage. In both cases, the court considered whether the police officers had informed the defendants that they had the right to refuse to consent to the searches. The court's consideration of this circumstance, however, was limited to determining whether the defendants' subsequent consent to the searches was valid. It was not considered in determining whether the defendants had been seized before they were searched. Indeed, the *Mendenhall* court

determined that the defendant had not been seized before the search, and in so concluding stated that "[o]ur conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed." *Mendenhall, supra*, 446 U.S. at 555, 100 S.Ct. at 1877–1878, 64 L.Ed.2d at 509–510.

*Bostick* involved police officers routinely boarding buses at scheduled stops to ask passengers for permission to search their luggage. The court reasoned that because the defendant's freedom of movement under such circumstances was restricted by a factor independent of police conduct, *i.e.*, by his being a passenger on a bus, the "free to leave" analysis conducted when the police approach a person in a public place was inapplicable. Rather, the relevant inquiry was "whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *Bostick, supra*, 501 U.S. at 436, 111 S.Ct. at 2387, 115 L.Ed.2d at 400. While the court did observe that one fact "particularly worth noting" in the case was that the police officers had specifically advised the defendant that he had the right to refuse to consent to the search of his luggage, the court reiterated its adherence to a totality-of-the-circumstances test in determining whether a particular encounter constitutes a seizure. *Id.* at 439, 111 S.Ct. at 2388–2389, 115 L.Ed.2d at 401–402. Thus, *Bostick* also does not support Jones's contention that an encounter is rendered nonconsensual merely because an officer does not inform an individual that he is free to leave.

*Retherford* and *Robinette* involved traffic stops. In *Robinette*, the Supreme Court held that a citizen stopped for a traffic offense must be clearly informed by the police officer that he is free to go after a valid detention, before the officer attempts to engage the citizen in a consensual interrogation. *Id.*, 73 Ohio St.3d at 655, 653 N.E.2d at 698–699. Jones asserts that, under the rationale of *Robinette*, there is "no reason" why only a traffic offender must be told that he is free to leave in order for the encounter to be considered consensual. We disagree. A person is seized within the meaning of the Fourth Amendment when he is pulled over in his car by a police officer. *Retherford, supra*, 93 Ohio App.3d at 598, 639 N.E.2d at 506. The *Robinette* court reasoned that a "clear break" was required between a citizen's detention for a traffic violation and a police officer's attempts to engage the citizen in a subsequent consensual interrogation because a "consensual encounter" immediately following a detention is likely to be "imbued with the authoritative aura of the detention." *Id.* at 655, 653 N.E.2d at 699. Thus, the starting point for the rationale underlying the *Robinette* decision was

that a detention, or seizure, had already occurred, as a result of which the average citizen would not feel free to leave absent an express statement to the contrary. The court distinguished between the case before it and ones in which citizens had not been detained immediately prior to being questioned by the police, and expressly recognized that such consensual encounters between citizens and police are "an important, and constitutional, investigative tool." *Id.* Thus, Jones's contention that the *Robinette* rule should be applied to all consensual encounters, whether they immediately follow a detention, is untenable.

Because we have determined that the trial court was correct in concluding that Jones was not seized prior to the detectives' search of him, and that until that point the encounter was consensual in nature, we need not address whether the detectives had objectively reasonable facts upon which they could have legally detained Jones.

Next, Jones argues that even if he was not seized before the detectives searched him, he was arrested and searched absent probable cause.

A warrantless arrest is constitutionally valid if:

"[A]t the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the * * * [individual] had committed or was committing an offense." *Beck v. Ohio* (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145; *State v. Heston* (1972), 29 Ohio St.2d 152, 155–156, 58 O.O.2d 349, 351, 280 N.E.2d 376, 379.

Based on the detectives' special training in narcotics interdiction, the trial court found that the brown tape around Jones's ankles and the tightening of his pants legs around the packages provided the detectives "with more than articulable suspicion." We can infer that the court determined that this "more than articulable suspicion" amounted to .probable cause to arrest Jones because it concluded that the packages were seized during a search pursuant to a lawful arrest, and that therefore the detectives did not need to obtain a search warrant to open them.

The evidence in the case supports the trial court's implicit finding of probable cause. As discussed *supra,* Jones's procedure in purchasing his ticket and his itinerary both matched the drug courier profile. Moreover, Jones's responses to the detectives' questions could have reasonably heightened their suspicion about him. For instance, Jones told the detectives he was going to Cleveland to visit his Uncle James, but was unable to give his uncle's last name, address, or telephone number. Jones also stated that he was going to Cleveland to get his life together, but his visit was to last only one and one half days.

Both detectives also testified regarding their extensive drug interdiction experience. Logan testified that he had been a police officer for seventeen years and had worked with the drug interdiction unit for the past six years. During that time, he had received approximately two to three hundred hours of specialized training in drug interdiction. Logan also testified that he had come across this particular mode of transporting narcotics, that is, individuals taping packages to their bodies, on twenty to thirty other occasions. Based on his drug interdiction experience, he believed that Jones was transporting narcotics when he saw the tape wrapped around Jones's ankle.

Lubonovic testified that he had been a police officer for over fifteen years and that he had been assigned to the drug interdiction unit for the past four years. He had received approximately forty hours of specialized training in airport drug interdiction. According to Lubonovic, when he saw Jones's pantleg tighten on something around his ankle, there was "no doubt" in his mind what it was.

Based on the foregoing, the trial court could reasonably find that the detectives' knowledge, information, and belief were sufficient to form the probable cause necessary to arrest Jones for drug trafficking. Logan and Lubonovic had probable cause to arrest Jones when Logan saw the brown tape wrapped around Jones's right ankle and Lubonovic saw Jones's pantleg tightening on something around his left ankle.

We must now determine whether the trial court properly found that the search of Jones's person, including the opening of the packages removed from his ankles, was a search incident to Jones's arrest.

The right of police officers to search a suspect incident to a lawful arrest has been a long-recognized exception to the warrant requirement of the Fourth Amendment. *Weeks v. United States* (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; *Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. Pursuant to a search incident to arrest, the police may conduct a full search of the arrestee's person, and that search is not limited to the discovery of weapons, but may include evidence of a crime as well. *United States v. Robinson* (1973), 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427; *Gustafson v. Florida* (1973), 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456. Further, the actual arrest need not precede the search as long as the fruits of the search are not used to support probable cause for the arrest. *Rawlings v. Kentucky* (1980), 448 U.S. 98, 111, 100 S.Ct. 2556, 2564–2565, 65 L.Ed.2d 633, 645–646; *State v. Tillman* (Sept. 30, 1993), Montgomery App.No. 14060, unreported, 1993 WL 385821.

In this case, Logan raised Jones's pantleg and Lubonovic touched the package taped around Jones's ankle before they formally arrested Jones. As we discussed *supra,* the trial court's implicit finding that probable cause existed for

Jones's arrest when Logan saw the tape around Jones's right ankle and Lubonovic observed Jones's pantleg tightening on something around Jones's other ankle is supported by the record. Thus, Logan's and Lubonovic's actions after that point were not necessary for them to have probable cause for Jones's arrest. Therefore, Logan's raising of Jones's pantleg and Lubonovic's touching of the package were permissible as searches incident to Jones's arrest, even though the searches preceded his arrest.

The search incident to a lawful arrest exception is composed of two separate considerations. First, the police may search the *person* of the arrestee by virtue of the lawful arrest. Second, the police may search the *area within the control of the arrestee*. *Robinson, supra,* 414 U.S. at 224, 94 S.Ct. at 471, 38 L.Ed.2d at 434. With respect to the opening of the packages removed from his ankles, Jones argues that the warrantless search was unreasonable because he was secured at the time the packages were opened, there was no fear that the evidence could be destroyed, and there was time to obtain a search warrant. While Jones cites no authority in support of his argument, we assume that he is relying upon *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, for the proposition that, because there was no possibility that he could have gained possession of the evidence and destroyed it, the detectives did not have authority to conduct a warrantless search of the packages. In other words, the detectives' search of the packages could not be deemed a search incident to his arrest because the packages were not in the area within his control.

We agree with Jones that if the detectives' authority to open the packages was based upon the packages being in the area within Jones's control, then the warrantless search of the packages would have been unreasonable. After the detectives arrested Jones, they handcuffed him and escorted him to the airport security office, where the packages were removed from his ankles. Logan, Lubonovic, Bollinger, and Rockwell were in the office with Jones. Under these circumstances, there can be no doubt that the packages were not within Jones's control at the time they were searched. Therefore, there was no possibility that Jones could destroy the evidence, and there was no reason the detectives could not obtain a search warrant before opening the packages.

In our judgment, however, the detectives' search of the packages was proper by virtue of their authority to search Jones's *person* as part of the search incident to his arrest. *Robinson, supra; Gustafson, supra.* In *Robinson,* the defendant was arrested for operating a motor vehicle after his permit had been revoked. After the police officer placed Robinson under arrest, he searched Robinson. During the search, the officer felt an object in Robinson's breast pocket. He pulled out the object, which turned out to be a crumpled up cigarette package. The officer then opened the cigarette package and found what was later deter-

mined to be heroin. The heroin was admitted into evidence at defendant's trial and resulted in his conviction. The court of appeals reversed Robinson's conviction, holding that the heroin had been seized in violation of the Fourth Amendment.

After noting that a search incident to arrest involves two distinct propositions, the search of the arrestee's person and the search of the area within the arrestee's control, the Supreme Court observed that the validity of the search of the arrestee's person had remained "virtually unchallenged" until this case. 414 U.S. at 224, 94 S.Ct. at 471, 38 L.Ed.2d at 434. The court then traced the historical justifications for permitting "a relatively extensive exploration of the person" incident to a lawful custodial arrest. *Id.* at 227, 94 S.Ct. at 473, 38 L.Ed.2d at 436. One of the court's conclusions based upon that analysis was that neither *Chimel, supra,* nor *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, limited the officer's authority to conduct a full search of the arrestee's person incident to a lawful custodial arrest. *Robinson,* 414 U.S. at 225–228, 94 S.Ct. at 472–474, 38 L.Ed.2d at 434–437. The court held that the search of a person incident to a lawful custodial arrest was not only an exception to the warrant requirement of the Fourth Amendment, it was also a "reasonable" search under that Amendment. *Id.* at 235, 94 S.Ct. at 477, 38 L.Ed.2d at 440–441. The court concluded:

"The search of [defendant's] person conducted by [the officer] in this case and the seizure from him of the heroin, were permissible under established Fourth Amendment law. While thorough, the search partook of none of the extreme or patently abusive characteristics which were held to violate the Due Process Clause of the Fourteenth Amendment in *Rochin v. California* (1952), 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183]. Since it is the fact of the custodial arrest which gives rise to the authority to search, it is of no moment that [the officer] did not indicate any subjective fear of the [defendant] or that he did not himself suspect that [the defendant] was armed. Having in the course of a lawful search come upon the crumpled package of cigarettes, he was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them as 'fruits, instrumentalities, or contraband' probative of criminal conduct." (Footnotes and citations omitted.) 414 U.S. at 236, 94 S.Ct. at 477, 38 L.Ed.2d at 441.

In *Gustafson,* a case decided the same day as *Robinson,* the defendant was arrested for driving without possession of an operator's license. After arresting Gustafson, the police officer searched Gustafson's person. As a part of the search, the officer placed his hand inside Gustafson's left front coat pocket and pulled out a Benson & Hedges cigarette box. The officer opened the cigarette box and found what appeared to be marihuana cigarettes inside. The marihuana cigarettes were introduced into evidence at Gustafson's trial and resulted in his conviction for unlawful possession of marihuana.

On appeal to the United States Supreme Court, Gustafson argued that in his case, unlike *Robinson*, there were no police regulations that required the officer to take him into custody, nor were there police department policies that required full-scale body searches upon arrest. In *Robinson*, the court did observe that the police officer had searched the defendant in accordance with police department procedures, but specifically stated that "[s]uch operating procedures are not, of course, determinative of the constitutional issues presented by this case." *Robinson*, 414 U.S. at 223, 94 S.Ct. at 471, 38 L.Ed.2d at 433–434, fn. 2. Therefore, the court rejected Gustafson's contention that his case was distinguishable on that basis. *Gustafson, supra,* 414 U.S. at 265, 94 S.Ct. at 491–492, 38 L.Ed.2d at 461. Based upon its reasoning in *Robinson*, the court found that the search of Gustafson's person, including the opening of the cigarette box pulled from his coat pocket, was a permissible search incident to a lawful arrest and affirmed Gustafson's conviction for possession of marihuana. *Id.* at 266, 94 S.Ct. at 492, 38 L.Ed.2d at 461–462.

The Ohio Supreme Court has followed *Robinson* and *Gustafson*. See *State v. Ferman* (1979), 58 Ohio St.2d 216, 12 O.O.3d 206, 389 N.E.2d 843; *State v. Mathews* (1976), 46 Ohio St.2d 72, 75 O.O.2d 150, 346 N.E.2d 151.

Here, Jones's arrest was supported by probable cause. Thus, it was a lawful custodial arrest and the detectives were entitled to conduct a full search of Jones's person incident to the arrest. We can perceive of no material distinction between the extent of the searches in *Robinson* and *Gustafson* and the one in this case. The packages removed from Jones's person were opened and the contents inspected in much the same way that the cigarette package was removed from Robinson's person, opened, and inspected, and the cigarette box was removed from Gustafson's person, opened, and inspected. Therefore, the detectives' opening of the packages removed from Jones's ankles to inspect their contents was a proper search incident to a lawful arrest.

In conclusion, what began as a consensual encounter between Jones and the detectives escalated into probable cause to arrest Jones for trafficking in cocaine. The detectives' search of Jones's person, including the opening of the packages removed from Jones's ankles, was a permissible search incident to a lawful arrest. Therefore, the trial court did not err when it overruled Jones's motion to suppress.

The assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

Fᴀɪɴ and Fʀᴇᴅᴇʀɪᴄᴋ N. Yᴏᴜɴɢ, JJ., concur.