JOURNAL ENTRY AND OPINION
Plaintiff-appellant State of Ohio appeals from the granting of co-defendants/appellees[1] motion to suppress evidence. For the reasons adduced below, we affirm in part, and reverse and remand in part.
A review of the record on appeal in these consolidated notices of appeal indicates that the stop, search, and seizure herein occurred on February 10, 2000 at Cleveland Hopkins Airport. The co-defendants were subsequently indicted.
The co-defendants filed their motion to suppress evidence on April 27, 2000. The trial court conducted a two-day hearing on the motion commencing on June 6, 2000, and continuing on July 24, 2000.
According to the suppression hearing transcript from the first day, the state presented the testimony of three law enforcement officers. There was no translator for any of the co-defendants present at this session of the motion hearing. Tr. 37. The first witness for the state was City of Cleveland Police Detective Deborah Harrison, who was assigned to the Drug Enforcement Administration Task Force at the time of the offenses herein. Prior to the arrival of the defendants' flight, Harrison's office had received information from their counterparts in Los Angeles to be on the lookout for several people. On the date of these offenses, Detective Harrison was attired in plain clothes at the airport acting as backup to DEA Special Agents Stirling and Bordensen, also in plain clothes, who followed two female suspects as they deplaned in Cleveland. According to the Detective, the special agents approached the two defendants, presented their special agent identification cards, and told the females, who were seated, that they were federal officers. The agents did not block their path, with agent Bordensen standing to the side of one suspect and agent Stirling seated next to the other suspect. No weapons were displayed. The agents used normal, non-aggressive speaking voices, and asked to see some identification and airline tickets. Tr. 23-24. Harrison testified that the suspects were not ordered to produce this information. After the suspects had complied with the request and had their papers almost immediately returned to them, the agents then asked for consent to search their pocketbooks. Based on oral consent, the pocketbooks were then searched. Based on information supplied by the two female suspects, Detective Harrison contacted DEA Task Force Officer Negron, who was at the baggage pickup area with a drug-sniffing dog (named Stuka) and its canine handler (DEA Task Force Officer Coco), to check the female suspects' checked luggage for the scent of narcotics. The checked luggage, which had been removed from the luggage bound for the connecting flight and set aside based on the information obtained from Los Angeles, was examined by the dog which detected the scent of narcotics therein. The fact of the positive indication with the luggage was radioed by Officer Negron back to Detective Harrison at the boarding gate area.
Based on this positive indication of drugs by the dog, the two female suspects were placed under arrest and a warrant to search the luggage was then allegedly sought and obtained. These warrants pertaining to these two women are not in evidence and are not mentioned in the transcript: The only mention of a warrant being actually obtained is with regard to Larios. See Tr. 33 (we had a Cleveland search warrant to open her bags). Prior to the arrest, Detective Harrison testified that the two suspects were free to go.
Once the two female suspects were arrested, Detective Harrison approached defendant Larios, identified herself as a police officer and displayed her police identification card. Larios never told Harrison that she could not speak English, and she carried on a conversation with Harrison. Tr. 31. When asked, Larios gave Harrison permission to speak with her. Harrison then asked for identification from Larios, received it, and then returned it to the suspect. Harrison then asked to see Larios' airplane ticket; Larios complied. The ticket was for a flight originating in Los Angeles, California, with a destination of Providence, Rhode Island, with a connecting flight in Cleveland. Also from the airplane ticket, Harrison noticed that Larios had checked some baggage, too, and that Larios had the same destination as the other two female suspects. Harrison contacted Officer Negron in the baggage area to intercept Larios' luggage and have the dog check that luggage, too, for the scent of drugs. While this was going on, Larios was not arrested and had boarded the plane she was waiting for. A short time later, the baggage area officers informed Harrison that Larios' bags had tested positive for the presence of drugs. Based on this information, Harrison, with the permission of the plane's pilot, boarded the waiting aircraft with Cleveland Police Officer Massa, and requested of Larios that she come with them, telling Larios that she was being detained so that the police could obtain a search warrant for the checked luggage. As Larios was about to leave her seat on the plane, Harrison observed that she dropped a tissue, which was recovered and found to contain two small baggies of cocaine. Ultimately, Larios' checked luggage was opened and searched pursuant to a warrant, yet no drugs were found inside.[2]
Harrison testified that she had observed a small number of occasions where a drug sniffing dog detected the presence of drugs in an object, yet there were no drugs found.
DEA Special Agent Gregg Bordensen described the stop of the suspects as a consensual encounter. Bordensen testified that they identified the suspects as the drug couriers based on two names they had received from their counterparts in Los Angeles. Bordensen interviewed Lithalang at boarding gate C-29 by approaching Lithalang who was seated facing the window overlooking the runway area. Bordensen came up behind Lithalang and stood next to her, presented his identification and further identified himself as a DEA agent in a calm, normal tone of voice. No weapons were displayed. Bordensen asked if Lithalang had identification; Lithalang presented Arizona identification with her name on it. Bordensen then returned the Arizona identification to Lithalang and then asked if she had an airline ticket; Lithalang produced a ticket with her name on it. Bordensen then returned the airline ticket to Lithalang and asked her if she was carrying any drugs or large sums of money; Lithalang then asked what's this all about. Tr. 49. Bordensen informed Lithalang that the DEA was looking for people carrying drugs and money through airports, to which she replied oh. Id. He then again asked Lithalang if she was carrying drugs or large sums of money; Lithalang said no. Id. He then asked if he could check her purse and luggage. Lithalang was silent. He then asked if she had checked any baggage, and she responded yes. Id. at 49-50. He then repeated his request whether they could check her purse and luggage, and she responded sure, go ahead. Id. at 50, 56, 59. He thanked her, stepped back, and then spoke with Detective Harrison and agent Stirling, informing them that he had obtained voluntary consent to search Lithalang's luggage and purse. Harrison then radioed the baggage area officers to search the luggage, which had been taken off the plane in Cleveland and isolated from the remaining luggage bound for the connecting flight by DEA agents. Once the drugs were detected at the baggage area and this fact was made known to the officers at the boarding gate, the officers at the boarding gate arrested Lithalang and Namsaly. Prior to the arrest, Bordensen never informed the suspect that she did not have to answer any questions put to her. Id. at 56. According to the witness, the suspects were free to leave up to the point when drugs were indicated in the checked luggage. Id. at 57.
DEA Special Agent Charles Stirling, with sixteen years of service in the DEA, including approximately 500 to 800 consensual encounters at airports involving drugs, testified that he approached suspect Namsaly at boarding gate C-29 based on the names of two suspected couriers on the Los Angeles/Providence flight, which names were provided by DEA counterparts in Los Angeles. He observed Namsaly and Lithalang exit the arriving plane at concourse A, walk over to concourse C, and seat themselves in the boarding area of their connecting flight in front of a window overlooking the runway area; an empty seat separated the two women. Larios was observed in the company of the two female suspects, but she seated herself at the end of that row of seats overlooking the runway area. He approached Namsaly and sat down next to her, he did not block her path and no guns were displayed. Using a conversational tone of voice he identified himself to Namsaly as a DEA agent, showed her his identification, and asked if he could ask her a few questions; Namsaly replied yes. Tr. 67. When asked, Namsaly said that she had just flown in from Los Angeles on her way to Providence, Rhode Island. He then asked if he could see some identification; Namsaly took a United States passport from her purse and handed it to the agent. He briefly looked at the passport, verified that it was hers, and handed it back to Namsaly. He then asked if he could see her airline ticket; Namsaly indicated that Lithalang had Namsaly's ticket in her possession. He then told Namsaly that he was looking for drugs and money linked to drugs which may come through the airport, and asked if he could check her person and her luggage; Namsaly replied yes. Id. at 68-69, 74, 78. Based on this positive response the agent looked through her carry-on shopping bag which was found to contain some ceramic canisters. While Namsaly held open her purse, the agent looked inside and then said thank-you. He then walked back to Detective Harrison and informed her that he had received consent to search the luggage in baggage. After the bags were checked and it was indicated that drugs were present therein, the agents at the boarding gate area placed Namsaly and Lithalang under arrest. Prior to the arrest, Agent Stirling stated on cross-examination that he did not order Namsaly to do anything, and he did not tell her that she had the right to walk away and not respond to any questioning. Tr. 75-76. Agent Stirling also stated that he boarded the connecting flight aircraft, but did not board with the anticipation of arresting Larios. Id. at 78.
The court recessed the hearing on the motion to suppress following this testimony by the detective and DEA agents.
On July 24, 2000, the court reconvened the motion hearing. At this time, the defense presented the testimony of Larios, Namsaly, and Lithalang. Each of the women testified that they exited the plane arriving from Los Angeles and stopped briefly at a restroom as they walked to their connecting flight which would board at another concourse in the airport.
Larios, through an interpreter, testified that she was born in Mexico and was residing in the United States at the time of the offenses herein. As the defendants sat in the boarding area waiting for their connecting flight to Providence, Rhode Island, Larios noticed two men speaking with the other two defendants. She could not hear what they were saying, as they were not speaking that loud. Tr. 12. A woman (Detective Harrison) then approached her and, using a normal tone of voice, see Tr. 12, asked for identification; Larios showed her identification and Harrison left with the identification, returning a short time later and giving the identification back to her. Larios, after receiving her identification back from Harrison, then boarded the connecting flight. While she was seated on board that flight, Harrison approached, grabbed her arm, and said something about drugs being in her suitcase; Larios claimed that she did not understand what Harrison was taking about. Larios was removed from the plane; she claimed that she told the officers that she did not speak English. Tr. 8. She claimed that she did not give consent to search her checked luggage. Id. She denied any knowledge about any drugs found that day at the airport. She denied on cross-examination that a Spanish speaking officer, Lisa Keener, advised her of her rights at the airport. Id. at 11. Further on cross-examination, Larios stated that Harrison wasn't that aggressive on the plane, but that she pull (sic) my arm very hard. Id. at 12.
Namsaly testified that she was born in the United States. She corroborated the fact that Agent Stirling approached her as she was seated at the window of her connecting flight's boarding gate and that the agent asked to see her identification. She produced the identification and the agent left with it, returning the identification to her a short time later. The agent then asked to see her airline ticket; she responded that her sister-in-law (Lithalang) had possession of the ticket. The agent inspected the ticket, noted that the ticket indicated that luggage had been checked, and then returned the ticket to Namsaly. Tr. 20. She claimed that she was never asked for, or granted, consent to search the checked luggage. Tr. 17-18, 20-21. On cross-examination, Namsaly testified that the officers were not aggressive towards her, used normal tones of voice when speaking, and did not block or obstruct their way. Id. at 20, 22. When asked on re-direct examination whether she felt that she had to comply with the agent's asking whether she had anything in her bag, she replied, yes. Id. at 22. Namsaly stated that 15 to 20 minutes elapsed from the time the agents first approached her and Lithalang and asked for identification, to when they were placed under arrest. Tr. 18.
Lithalang testified that she was born in Laos and is a naturalized U.S. citizen. She stated that she gave the agent her identification when asked because she felt that she had to do it. Tr. 25. Several minutes passed between the time that she gave the agent her airline ticket and the time when it was returned to her. The agent did ask permission to search her carry-on bags. Tr. 26. She gave him permission to search her carry-on bags because she thought she had to do so. Id. at 26, 29. After searching her carry-on bags she was placed under arrest. Id. at 27. She never gave consent to search her luggage in baggage. The agent that questioned her did so in a normal tone of voice, was not aggressive towards her, and did not obstruct her path in any way. Id. at 28-29.
Subsequent to the filing of post-hearing briefs by the parties on the issue of suppression, the trial court ruled that the motion was granted. In the case of Larios, the trial court stated the following in its order journalized on September 27, 2001:
 Motion of defendant to suppress granted. In light of State of Ohio v. Ranford Washington 2001 Ohio Appellate LEXIS 2629. Defendant's motion to suppress is granted. Absence of any information regarding this defendant in the officer's possession was insufficient to justify their detentions of her. Given the defendant's meager grasp of the English language, it is clear based on the totality of the circumstances that this encounter was a detention and that the defendant did not feel free to go. Therefore, defendant was in no position to validly consent to a search, so the search as well as the detention and subsequent arrest was illegal.
In the case of Namsaly, the trial court stated the following in its order journalized on October 11, 2001:
 Pursuant to State of Ohio v. Ranford Washington No. 77481 Court of Appeals, Eight (sic) Appellate District, Cuyahoga County 2001 Ohio App. LEXIS 2629, defendant's motion to suppress is granted.
In the case of Lithalang, the trial court stated the following in its order journalized on October 11, 2001:
 Pursuant to State of Ohio v. Ranford Washington No. 77481 Court of Appeals, Eigth (sic) Appellate District, Cuyahoga County 2001 Ohio App. LEXIS 2629, defendant's motion to suppress is granted.
The appellant herein presents one assignment of error for review, stating:
 THE TRIAL COURT ERRED IN GRANTING APPELLEE'S (sic) MOTION TO SUPPRESS (sic) AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Initially, it is noted that:
 When reviewing a warrantless search, this court will reverse findings of historical fact only upon clear error, but makes a de novo determination when applying those facts to the law; whether a search was reasonable upon particular facts is a legal question, Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); State v. Harris (1994), 98 Ohio App.3d 543, 546, 649 N.E.2d 7, and the State has the burden to prove the intrusion reasonable. City of Xenia v. Wallace (1988), 37 Ohio St.3d 216, 524 N.E.2d 889. (Emphasis added.)
State v. Washington (2001), 144 Ohio App.3d 482, 488, 2001 Ohio App. LEXIS 2629, discretionary appeal disallowed in (2001), 93 Ohio St.3d 1446.
This court had cause to review another consensual search-type case involving drugs found inside a passenger's luggage at Cleveland Hopkins Airport, and stated the following standards relative to these types of police/citizen encounters:
 In State v. Jones (1996), 112 Ohio App.3d 206, 678 N.E.2d 285, stated:
 It is well settled that Fourth Amendment scrutiny is not triggered where a police officer approaches a person in a public place, asks to talk to him, receives permission to do so, and then poses questions to him. * * * [It is] not implicated because the person is not required to answer any of the officer's questions and is free to walk away. * * * Such encounters between the police and citizens are considered consensual encounters and do not involve any coercion or restraint of liberty. * * * Nor does an officer's request to examine a person's identification or for consent to search a person's luggage render the encounter nonconsensual, if the officer does not convey a message that compliance with his request is required. * * * A person is seized within the contemplation of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. * * *.
 In United States v. Mendenhall (1979), 446 U.S. 544, 64 L.Ed.2d 497, 100 S.Ct. 1870, the court enunciated the following factors to consider in determining whether a seizure has occurred:
 The threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. * * * Absent some evidence that one or more of these circumstances is present, police officers' contact with a citizen cannot, as a matter of law, amount to a seizure of that person.
 The court in Mendenhall also delineated several factors in determining whether an individual has freely and voluntarily consented to the requests of a police officer.
These factors include, but are not limited to:
 Whether a citizen's path was blocked; whether his ticket or identification was retained; whether there is a threatening presence of several officers; whether there was a display of a weapon by an officer; and whether the officer was in uniform.
 Regarding warrantless searches, the court in State v. Jackson (1996), 110 Ohio App.3d 137, 673 N.E.2d 685
stated:
 Warrantless searches are per se unreasonable unless they fall within an exception. One exception to this rule is when the subject consents. * * * Consent given after the use of coercion, duress, or trickery is not free and voluntary. * * * The government bears the burden of proving consent to the search by clear and positive evidence.
Further, in State v. Clelland (1992), 83 Ohio App.3d 474, 615 N.E.2d 276, the court stated:
 The voluntariness of a consent to the search is a question of fact to be determined under the totality of the circumstances and will not be reversed on appeal unless clearly erroneous.
State v. Bussey (Dec. 2, 1999), Cuyahoga App. No. 75301, 1999 Ohio App. LEXIS 5707 at 4-6.
The crux of the arguments in this case stems from (1) the State's belief that there was consent given to search the checked baggage with a drug-sniffing dog, and the appellees' belief that they did not give consent for that search, and (2) the trial court's conclusion, based on a totality of the circumstances, that Larios was not detained, but was instead seized, which, in tandem with her alleged deficiency in understanding English, invalidated any consent she may have given to search the checked luggage. The search of the carry-on luggage is not an issue in this appeal. These arguments, which equate the examination of the checked luggage at an airport by a drug-sniffing dog to be a search which would require consent absent a warrant, is misplaced from the outset.
The use of trained dogs to detect drugs is permitted in airports. See United States v. Place (1983), 462 U.S. 696, 103 S.Ct. 2637,77 L.Ed.2d 110. Once an owner of the article, who is reasonably believed to be carrying narcotics, places it in the control of a third party, such as checking luggage into the baggage of a commercial airline, officers at the airport may temporarily detain that luggage for inspection by trained narcotics detection dogs without obtaining a warrant. This inspection may be made in an on-the-spot inquiry by immediately exposing the luggage to the dog, or by transporting the luggage to another location for examination by the dog. Id. 462 U.S. at 705-706. The drug-sniffing dog's detection of narcotics within a closed container at an airport, such as checked luggage, is not a search which implicates the Fourth Amendment. Id. Therefore, no consent of the suspect owner is required prior to using the dog. Assuming that the detention duration of the luggage has been reasonable, once the dog detects the presence of narcotics in the closed container, this indication can be used as a basis for probable cause to obtain a search warrant or to detain the owner of that suspect luggage under a Terry-type, less than probable cause, stop. See Terry v. Ohio (1968), 392 U.S. 1, 20 L.ED.2d 889, 88 S.Ct. 1868.
The key to this type of investigative detention of the person is whether the police conduct exceeded the limits of a Terry-type investigative stop in terms of reasonable duration, scope, and means. In assessing the police conduct, one must look to whether the police diligently pursued their investigation so as to minimize the intrusion on the suspects' Fourth Amendment interests. Place, 462 U.S. at 708-710. In the present case, the officers in Cleveland had been alerted by their counterparts in Los Angeles to be on the lookout for Namsaly and Lithalang on a particular flight on the suspicion of being drug couriers. Based on this information, the officers could temporarily detain them and their luggage under Terry so that the officers could dispel their suspicions of criminal activity. Id. The involvement with the suspects, from the time they were approached to the time the luggage was inspected to the time they were placed under arrest, was approximately 20 minutes. The scope and means utilized in the detention were professional and very narrowly drawn. The police, in obtaining identification and airline tickets from the suspects, simply assured themselves that they were questioning the correct suspects. The suspects voluntarily spoke with the officers and gave consent to search their carry-on luggage. The officers did not block their path, act aggressively, issue threats, retain any articles given them to review, or use a show of force. The suspects can point to nothing, other than the mere fact that the police were talking to them, to support their subjective and objectively unreasonable belief that they were compelled to cooperate with the police. Under our de novo review of applying the facts to the law, we conclude that the officers acted reasonably under the circumstances and that the detention and search of Namsaly and Lithalang was justified and properly limited in scope, manner, and duration.
Despite the propriety of the detention and search of the carry-on luggage in the concourse area of the airport, the positive reaction of the drug-sniffing dog to the checked luggage of these two women necessitated the authorities to obtain a search warrant prior to opening the checked luggage since their consent to search, as so found by the trial court, only pertained to their carry-on luggage. As stated previously, the record does not demonstrate that the authorities obtained a search warrant for Namsaly and Lithalang's checked luggage prior to opening that luggage and finding the contraband therein. Thus, the court did not abuse its discretion in granting the motion to suppress with respect to Namsaly and Lithalang.
With regard to Larios, that same de novo review prompts us to conclude that she was not seized at the time she was initially approached by Detective Harrison. That she was free to leave and under no coercion to cooperate is buttressed by the objective facts that, despite her later claim of being hampered by the English language, she engaged the Detective in conversation, produced identification and airline tickets, and then gave consent to search her purse, and, Harrison finding no contraband therein, she was permitted to board her connecting flight. Because she had boarded her connecting flight prior to the time when the other two defendants were arrested, it is safe to infer that this action (initial identification, search of the carry-on luggage, and boarding the connecting flight) took place in the space of less than 15 to 20 minutes (the total time period when the other two defendants were approached and placed under arrest). She was properly detained under Terry while on the connecting flight subsequent to the dog detecting, albeit inaccurately as it turned out when the search warrant was later executed on the luggage, the presence of drugs in her checked baggage. Having been properly detained for further questioning relative to the indication of drugs in her checked luggage, the fact remains that the police allegedly observed Larios discard a tissue when she was leaving her seat on the connecting flight and that this tissue, upon recovery by the police, contained cocaine. Having voluntarily abandoned the tissue and its contents, she has no standing to assert suppression of this contraband. See State v. French (1980), 64 Ohio St.2d 291, paragraph two of the syllabus. Suppression of the cocaine found inside the tissue was improper.
With regard to Larios' checked luggage, the police acted properly following the detection of contraband therein by the drug-sniffing dog. As previously identified herein, the record demonstrates that the officers obtained a warrant to open Larios' checked luggage. See Tr. 33.
In summary, the trial court did not err in granting the motion to suppress with regard to Namsaly and Lithalang, but did err in granting suppression with regard to Larios.
Judgment affirmed in part, and reversed and remanded in part.
This cause is affirmed in part and reversed and remanded in part.
The court finds there were reasonable grounds for this appeal. It is, therefore, considered that said appellant and appellee(s) each pay one-half of the costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
KENNETH A. ROCCO, P.J., CONCURS; COLLEEN CONWAY COONEY, J., CONCURS IN JUDGMENT ONLY.
[1] The co-defendants and their charged offenses include the following:
 1. In Cuyahoga App. No. 80326, Reynalda Larios (d.o.b. October 11, 1962), a female Massachusetts resident of Hispanic descent charged with the following: (a) possession of marijuana in an amount between 5,000 and 25,000 grams [R.C. 2925.11]; (b) preparation of drugs [marijuana] for sale [R.C. 2925.07]; (c) possession of drugs [cocaine] in an amount between 5 grams and 25 grams [R. C. 2925.11]; (d) preparation of drugs [cocaine] for sale [R.C. 2925.07]; (e) possession of criminal tools [money][R.C. 2923.24];
 2. In Cuyahoga App. No. 80379, Ann Namsaly, aka Vatsana Vienge (d.o.b. January 1, 1982), a female Massachusetts resident of Asian descent charged with the same five offenses as were leveled against co-defendant Larios;
 3. In Cuyahoga App. No. 80380, Huyen Lithalang, aka Lam Sayahn, aka Huyen Lithalangsy (d.o.b. March 7, 1976), a female resident of Asian descent, residing at the same Massachusetts address as co-defendant Namsaly, and charged with the same five offenses as the other co-defendants.
[2] Marijuana was found in the checked luggage of the other two co-defendants when the search was executed after their arrests.