OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Nathaniel P. Shelton, filed April 3, 2007. On November 17, 2006, a Montgomery County Grand Jury indicted Shelton on one count of possession of cocaine, in violation of R.C. 2925.11(A), a felony of the third degree, and possession of crack cocaine, in violation of R.C.2925.11(A), a felony of the second *Page 2 
degree. On November 21, 2006, Shelton entered a plea of not guilty. On December 12, 2006, Shelton filed a Motion to Suppress Evidence, which the trial court overruled on December 19, 2006, following a hearing. On February 16, 2007, Shelton entered a plea of no contest on the possession of crack cocaine charge, and the other charge was dismissed. At the time of his pleas, Shelton was on community control. He admitted to a violation of rule number one of his community control. The trial court sentenced Shelton to an agreed sentence of four years, imposed a fine and suspended Shelton's driver's license. The trial court also revoked his community control and imposed two twelve month sentences and one six month sentence, with each additional sentence to be served consecutive to each other but concurrent to the four year agreed sentence.
 {¶ 2} The events giving rise to this matter began on November 10, 2006, at approximately 8:40 p.m., when Officer Craig Sisco, a campus police officer for Good Samaritan Hospital, responded to the groundskeeper's garage and parking lot at 2115 Tennyson Avenue in Dayton, having been notified by another officer, Sergeant Pearsall, of a suspicious vehicle there. The campus authorities are sworn police officers who patrol Good Samaritan's numerous buildings and parking lots. A portion of the Good Samaritan property to which Sisco responded contains a building and a small driveway area that is fenced and secured, while another portion, containing a parking lot, is not fenced and has multiple means of ingress and egress. Both portions are subject to the authority of the campus police. A hair salon called Top of the Line Barber and Beauty, located at 2836 Salem Avenue, is on the west side of the unsecured parking lot and makes use of part of the lot.
 {¶ 3} When Sisco arrived at the scene, he parked directly next to the cruiser of *Page 3 
Sergeant Pearsall, who was first on the scene. Sisco observed Pearsall walking back to his cruiser from a 1985 Crown Victoria, parked in the unsecured lot, with an identification card in his hand. Another officer, Officer Watkins, arrived in his cruiser and parked beside Sisco, so that all three cruisers were behind the Crown Victoria. It was dark outside, and Sergeant Pearsall's spotlight illuminated the Crown Victoria.
 {¶ 4} Sisco and Watkins were able to observe Shelton through the rear window of the vehicle, from a distance of 25 to 50 feet. Shelton was alone in the car, and Sisco and Watkins observed him leaning down and reaching over to the passenger side of the car. The officers exited their cruisers and Watkins approached the driver's side of the car, and Sisco approached the passenger side. When Sisco reached the rear quarter panel of the car, he observed Shelton shoving a brown paper bag underneath the rear of the passenger seat. Next, Sisco observed Shelton reach into an "engineered compartment" in the back of the passenger seat that appeared to serve as a storage area. He observed Shelton withdraw what he believed to be the handle of a firearm from the compartment. Sisco then drew his weapon and ordered Shelton to drop the item. Shelton complied and put his hands up, and Sisco and Watkins ordered him from the car. After being handcuffed, Shelton was placed in one of the cruisers.
 {¶ 5} Officers from the City of Dayton Police Department then arrived on the scene, including Officer Michael Fuller. Pearsall, who had conducted a LEADS search in his cruiser, told Fuller that there were four outstanding warrants for Shelton's arrest, and Fuller confirmed the warrants with another LEADS search in his own cruiser. Fuller also learned that the owner of the vehicle was Laquetta Adams. Pursuant to the Dayton Police Department tow policy, Fuller performed an inventory search of the car, locating a paper bag containing a substantial *Page 4 
amount of powder and crack cocaine under the passenger seat. Fuller did not retrieve any weapons, and there was nothing in the compartment in the rear of the passenger seat. Shelton, having been placed under arrest and read his rights, was transported to jail.
 {¶ 6} Shelton asserts one assignment of error as follows:
 {¶ 7} "THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS CERTAIN EVIDENCE THAT WAS GAINED FROM APPELLANT IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS PURSUANT TO THE FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, AS WELL AS SECTION 14, ARTICLE I, [OF] THE OHIO CONSTITUTION."
 {¶ 8} According to Shelton, "his initial encounter with the police was not consensual," and there was no reasonable suspicion to justify the initial stop or subsequent search of his vehicle, in reliance onTerry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. In response, the State argues that Shelton's encounter with the Good Samaritan officers was consensual and also "based on a reasonable suspicion of criminal activity."
 {¶ 9} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An *Page 5 
appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." State v. Purser, Greene App. No. 2006 CA 14,2007-Ohio-192, ¶ 11.
 {¶ 10} "Contact between police officers and the public can be characterized in different ways. The first manner of contact and the least restrictive is contact that is initiated by a police officer for purposes of inquiry only. `[M]erely approaching an individual on the street or in another public place[,]' asking questions for voluntary, uncoerced responses, does not violate the Fourth Amendment. (Internal citation omitted). The United States Supreme Court has repeatedly held that mere police questioning does not constitute a seizure forFourth Amendment purposes. (Internal citations omitted). `[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; * * * provided they do not convey a message that compliance with their request is required.' (Internal citation omitted). A person approached in this fashion need not answer any questions, and may continue on his or her way unfettered by any real or implied restraint, and he may not be detained even momentarily for his refusal to listen or answer.
 {¶ 11} "* * *
 {¶ 12} "A more intrusive kind of contact is referred to as a Terry stop.' This stop constitutes a temporary detention of the individual, and it must be predicated upon a reasonable articulable suspicion. This type of detention constitutes a seizure, but it does not violate theFourth Amendment * * * if there is articulable suspicion that a person has committed or is about to commit a crime.'" State v. Aufrance, Montgomery *Page 6 
App. No. 21870, 2007-Ohio-2415. "A person is seized within the contemplation of the Fourth Amendment `only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" State v. Jones (1996), 112 Ohio App.3d 206, 211, 678 N.E.2d 285.
 {¶ 13} At the suppression hearing, Sisco, Fuller, and Makeda Lindsey, an acquaintance of Shelton's and an employee at Top of the Line Barber and Beauty, testified. Sisco stated that the groundskeeper's garage was closed when he responded to the scene, and he stated that there was no legitimate reason for anyone to be parked on the Good Samaritan property at that time of evening. According to Sisco, there were no other vehicles in the immediate vicinity of Shelton's. Sisco did not recall seeing any vehicles behind the salon, either. Sisco stated that the salon did not appear to be open, that the lights were off, but he stated that a woman emerged from the salon and Sisco believed she spoke to Pearsall. Sisco testified that all three cruisers were behind Shelton's vehicle, and that Shelton was not blocked in and had access to means of egress from the lot. According to Sisco, when he approached Shelton's vehicle, Shelton was not under arrest, and Pearsall was just verifying his identification. Upon recrossexamination, the following exchange occurred:
 {¶ 14} "Q. Now, * * * the time Officer Pearsall was there, Mr. Shelton, he couldn't have just drove off, could he?
 {¶ 15} "A. No, not at that point.
 {¶ 16} "Q. So, at the time you arrived, he wasn't free to just drive off; correct?
 {¶ 17} "A. No."
 {¶ 18} Officer Fuller testified, upon arrival at the scene, that he spoke briefly to *Page 7 
Pearsall and then verified the outstanding warrants in his own cruiser. Fuller learned that Laquetta Adams owned the car, and he testified that she was not at the scene. Fuller conducted an inventory search of the vehicle pursuant to Dayton Police Department tow policy. Fuller stated his partner, Daniel Reynolds, tested the substances found in Shelton's car using cobalt reagent, while Fuller observed him, and Fuller stated they tested positive for cocaine. Fuller stated that he did not see any other cars in the lot, and he did not see anyone come out of the salon, but that he was told that someone did come out of the salon. Fuller stated that there was nothing in the compartment behind the passenger seat, and that no weapons were found in the car. In response to questions from the trial court, Fuller indicated that there is significant drug activity in the area of the groundskeeper's lot. According to Fuller, the lot is "maybe within 50 yards of the large apartment complex in the 3900 block of Prescott. What ends up happening is it also is next to Tennyson, that becomes like a thoroughfare to get to these apartment buildings and actually to get into the entire neighborhood back there. So, we'd get all types of disturbance calls, people hearing gunshots from people shooting guns up in the air, suspicious vehicles and things of that nature."
 {¶ 19} Finally, Makeda Lindsey testified on Shelton's behalf. According to Lindsey, on the day of the incident, she phoned Shelton, whom she described as a client and friend of hers, to pick her up or follow her home from work because she was having problems with her car. Lindsey testified that she had a client in her chair in the salon and, "at exactly 8:30," she received a phone call from Shelton, asking her to come out to the parking lot and explain to the officers that he was there to pick her up *Page 8 
and take her home. Lindsey stated that she told Shelton to come in to the salon, and that the phone went dead. Lindsey testified that she ran outside and observed "like four police officers at every window with guns on the window" of Shelton's car. She stated that she "hollered from like the middle of the parking lot like what's going on," and that an officer yelled back at her to "get back inside." She stated that she returned to the salon, "finished up [her] client so she could kind of get out of harm's way," and then Lindsey "kept periodically going back outside trying to check on Mr. Shelton." After repeatedly being told to go back inside by one officer, Lindsey testified that she was told Shelton was being arrested. She stated that her car and her client's car were in the parking lot, parked in front of Shelton's car, and that Shelton's car was "like right in the middle of the lot." Lindsey stated that the police cars were behind Shelton's car, "like in a little `U.'" Lindsey testified that she offered to assume responsibility for Shelton's car. She also testified that the car did not belong to her.
 {¶ 20} In overruling Shelton's motion to suppress, the trial court made findings of fact and conclusions of law on the record. The court found, "the officers were parked behind the Defendant, [and] it was indicated he could have left even though the officers didn't believe he was free to leave."[1] The trial court determined that "there was no detention of the Defendant until such time as the officers ordered him from the vehicle. The encounter was consensual up until that point." According to the court, "the officers did not restrain the Defendant's liberty either by physically forcing him to *Page 9 
stay or by some show of authority that would have implicated theFourth Amendment." Further, the court determined that "Officer Sisco had reasonable and articulable suspicion that the Defendant was or had been engaged in criminal activity when he approached the vehicle without guns drawn, he saw furtive movements from the Defendant and then saw what appeared to him to be the butt of a gun that authorized or justified the officers to remove the Defendant from the vehicle for their safety." The court also noted that there "was no testimony to contradict the testimony of Officer Sisco that he observed what he believed to be the butt of the gun and that he observed furtive movements of the Defendant, that being that the Defendant dropped his shoulder and appeared to be shoving something under the seat."
 {¶ 21} The court continued, "Even if there were not specific articulable facts that would have permitted the Defendant to be removed from the vehicle, the Defendant's identification had already been run. And the fact that he had four active warrants for his arrest would have resulted in him being removed from the vehicle.
 {¶ 22} "And in addition, the vehicle was not searched incident to the Defendant removed from the vehicle. It instead was searched incident to his lawful arrest and further incident to the City's tow policy. The Defendant was under arrest. Pursuant to the City's tow policy, the officers had the authority to search that vehicle and inventory it pursuant to the tow policy."
 {¶ 23} Regarding Lindsey's testimony, the court determined that she was "not credible in light of the testimony of the officers," both of whom did not recall the presence of other vehicles in the lot. The court determined that Lindsey did not have the right or authority to receive the car, nor could the officers have released it to her *Page 10 
pursuant to the tow policy. Based upon the totality of the circumstances, the court concluded, "there was no violation of the Defendant's Fourth Amendment rights or any other rights afforded by the constitution."
 {¶ 24} We have thoroughly reviewed the record herein and, relying upon the trial court's ability to assess the credibility of Sisco, Fuller and Lindsey, we conclude, as did the trial court, that the initial contact between Pearsall and Shelton was consensual, and the subsequent seizure and arrest of Shelton and search of the vehicle did not violate Shelton's constitutional rights. The salon appeared to be closed, and there was no reason for Shelton to be parked where he was, when Pearsall approached his vehicle. The record makes clear that Shelton was not blocked in but rather had access to the lot's exits when approached by Pearsall. There is nothing in the record to indicate that Pearsall told Shelton that he could not leave the property, nor that he ordered Shelton to produce his identification. Sisco's testimony that Shelton was unable to depart while speaking with Pearsall does not establish that Pearsall in any way restrained Shelton's liberty, and theFourth Amendment is not implicated by Pearsall's nonrestrictive and consensual contact with Shelton. See U.S. v. Mendenhall (1980), 446 U.S. 544,100 S.Ct. 1870.
 {¶ 25} When Sisco approached Shelton's vehicle, he observed furtive movements as Shelton attempted to hide something under the passenger seat, and then Sisco observed what he believed to be the handle of a weapon in Shelton's hand. Clearly, at that time, Sisco had a reasonable, articulable suspicion of criminal activity that justified the seizure of Shelton and his removal from the vehicle. In fact, the area was known for criminal activity. Further, as the trial court noted, even without Sisco's *Page 11 
reasonable suspicion, the four outstanding warrants for Shelton, discovered by Pearsall, would have justified his arrest. Finally, Lindsey, whose testimony the trial court did not believe, did not own the vehicle, and the subsequent search thereof by Fuller was conducted both pursuant to Shelton's lawful arrest and incident to the tow policy of the Dayton Police Department. State v. Murrell (2002),94 Ohio St.3d 489, 2002-Ohio-1483; State v. Earley, Montgomery App. No. 19161, 2002-Ohio-4112. There being no constitutional violation, the trial court properly overruled Shelton's motion to suppress. Shelton's sole assignment of error is overruled. Judgment affirmed.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
Jill R. Sink
Ben M. Swift
Hon. Mary Katherine Huffman
[1] Only Sisco, who arrived after Pearsall approached Shelton, stated that Shelton was not free to leave during his encounter with Pearsall. *Page 1