[Cite as *State v. Shipp*, 2012-Ohio-6189.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                          :
                                       :       Appellate Case No. 24933
        Plaintiff-Appellee             :
                                       :       Trial Court Case No. 2010-CR-3793
v.                                     :
                                       :
KEVIN D. SHIPP                         :       (Criminal Appeal from
                                       :        Common Pleas Court)
        Defendant-Appellant            :
                                       :

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of December, 2012.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. #0069829, Montgomery
County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O.
Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

RICHARD A. NYSTROM, Atty. Reg. #00400615, 1502 Liberty Tower, 120 West Second
Street, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}   Defendant-appellant Kevin D. Shipp appeals from his conviction and sentence

for Improper Handling of a Firearm in a Motor Vehicle, following a no-contest plea.   Shipp

contends that the trial court erred by overruling his motion to suppress evidence seized as a result of the seizure of his wallet from his pocket and the search of the glove compartment of the motor vehicle he was driving.

{¶ 2}     We conclude that the trial court did not err in overruling Shipp's motion to suppress evidence, because there was probable cause to both arrest Shipp and search the glove compartment.   Accordingly, the judgment of the trial court is Affirmed.

### I.   Shipp Commits a Traffic Violation and Volunteers Information About a Gun in the Glove Compartment

{¶ 3}     In its decision overruling Shipp's motion to suppress (Dkt. 14, p. 1-3), the trial court made the following findings of fact:

On December 1, 2010 at approximately 11:30 pm, [Dayton Police] Officer [Daniel] Zwiesler observed Mr. Shipp make a right hand turn into the Big E Bar on North Main Street in the City of Dayton without continuously signaling for at least 100 feet his intention to turn.   Officer Zwiesler, with probable cause to believe Mr. Shipp was in violation of Dayton [Revised Code of General Ordinances] Section 71.31 and/or R.C. Section 4511.39, initiated a traffic stop.   When Mr. Shipp could not produce a valid Ohio Driver's license upon request, Officer Zwiesler ordered him out of his car, removed Mr. Shipp's wallet from his pants pocket and located his Ohio Photo ID.   In response to Officer Zwiesler's call for backup, Trotwood PD Officer [Matthew] Barnes [FN1] arrived and placed Mr. Shipp into the back of his Trotwood cruiser while Officer Zwiesler called in to determine if Mr. Shipp had a valid Ohio

Driver's License.  He did not and Officer Zwiesler made the decision to arrest Mr. Shipp for driving illegally and to tow and inventory the vehicle pursuant to the [Dayton Police Department's] General Order/Towing Motor vehicles ("the Policy").

[FN1] Among other responding officers including DPD Officers [Gordon L.] Cairns and [Chad] Knight.

Officers Zwiesler and Cairns began a property inventory [FN2] pursuant to the Policy at which time Mr. Shipp became visibly agitated and began shouting.  Because he was in Officer Barnes' cruiser with the windows rolled up [FN3], Officer Zwiesler could not hear what Mr. Shipp was saying. DPD Officer Knight was standing next to Barnes' cruiser, however, and heard Mr. Shipp yelling that the Officer's "search" of his vehicle was illegal because they had no warrant and they could not use the gun in the glove box against him.  Officer Knight informed Officer Zwiesler of Mr. Shipp's statements regarding the gun whereupon Officers Zwiesler and Cairns each pulled down the right corner of the locked glove box and were able to see with flashlight illumination a gun and box of ammunition in the glove box.  Because none of Mr. Shipp's keys opened the glove box, Officer Zwiesler pried the box open using a screw driver and recovered the gun and ammunition.  The gun had six live rounds chambered before Officer Zwiesler unloaded the weapon.

[FN2] Officer Barnes and Officer Harvey may also have assisted at some point during the property inventory.

[FN3] It was a cold December night.

{¶ 4} There is competent, credible evidence in the record to support the trial court's findings of fact.

## II.  The Course of Proceedings

{¶ 5} Shipp was charged by indictment with one count of Having a Weapon While Under a Disability, with a previous conviction for a drug offense, in violation of R.C. 2923.13(A)(3); and with one count of Carrying a Concealed Weapon, in violation of R.C. 2923.12(A)(2).  He moved to suppress the evidence obtained following the traffic stop, contending that it was obtained as the result of an unlawful search of the glove compartment of the motor vehicle he was driving.

{¶ 6} After the trial court overruled his motion to suppress, Shipp pled guilty to Improper Handling of a Firearm in a Motor Vehicle, in violation of R.C. 2923.16(B), a felony of the fourth degree, with which he had been charged by a bill of information, Shipp having waived indictment on that charge.   The other charges were dismissed.

{¶ 7} Apparently realizing that he had inadvertently failed to preserve the suppression issue for appeal by pleading guilty, Shipp moved to withdraw his plea, and the trial court granted his motion.  He was indicted for Improper Handling of a Firearm in a Motor Vehicle, in violation of R.C. 2923.16(B), the bill of information charging him with that offense was vacated, and the matter was set for trial.

{¶ 8} Before trial, Shipp pled no contest to the charge of Improper Handling of a Firearm in a Motor Vehicle.  The trial court entered a judgment of conviction, and sentenced Shipp to community control sanctions for a period not to exceed five years.

{¶ 9} From his conviction and sentence, Shipp appeals.

### III. Probable Cause Existed Both to Arrest Shipp

### and to Search The Glove Compartment

{¶ 10}   Shipp's sole assignment of error is as follows:

WHETHER THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE FRUIT OF A WARRANTLESS SEARCH AND THEREBY PRECLUDED DEFENDANT'S CONSTITUTIONAL RIGHTS TO UNREASONABLE SEARCHES [sic] AND DUE PROCESS UNDER THE *FOURTH, FIFTH,* AND *FOURTEENTH AMENDMENTS* OF THE *UNITED STATES CONSTITUTION* AND *ARTICLE I, SECTION 10,* OF THE *OHIO STATE CONSTITUTION*.   (Italics in original.)

{¶ 11}   In ruling on a motion to suppress, "the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses."  *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994) (Citation omitted.)   Accordingly, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.   Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard."  *Id.*

{¶ 12}   Although he frames his assignment of error as a question, and labels it "Issue I," it is clear that Shipp is contending that the firearm found in the glove box, which is the basis for the charge of which he was convicted, was obtained as the result of an unlawful search and seizure.   He makes a number of arguments in support of his assignment of error.

We will address the arguments in the order in which Shipp presented them in his brief.

## A. The Removal of Shipp's Wallet

{¶ 13}   Shipp contends that Officer Zwiesler had no proper basis for seizing Shipp's wallet from Shipp's pants pocket.

{¶ 14}   Officer Zwiesler was asked, on re-direct examination, why he took Shipp's wallet from Shipp's pants pocket (Tr. 37):

Q.   All right.  Now, what was your reasoning into reaching into his pocket?

A.   I had asked him where his ID was.  He told me that it was in his back pocket in his wallet and I retrieved it –

Q. Did you want- -- I'm sorry, go ahead.

A.   And I retrieved it.

Q.   Did you want him retrieving it?

A.   No, I did not.

Q.   Why is that?

A.   I don't want people reaching into pockets for my safety.  Some weapons, knives, razor blades, some people carry box cutters that are – that they use at work or any other improvised weapon.  I could see the wallet and so I removed it.

{¶ 15}   Officer Zwiesler testified that he had not met Shipp before, and did not know anything about him.  Earlier on re-direct, the State attempted to elicit testimony from Officer

Zwiesler concerning the high-crime character of the area in which Shipp was stopped, but the trial court sustained an objection to this line of testimony on the ground that it was outside the scope of cross examination.

{¶ 16}   On Shipp's re-cross-examination of Officer Zwiesler, the following exchange occurred (Tr. 41-43):

Q.   Officer, you say you don't want people you don't know reaching into a pocket to get their IDs out.   Do you ever make a traffic stop of a person that you don't know on sight?

A.   Yes.

Q.   Do you routinely reach into people's pockets to take their driver's licenses out?

MR. PARKER [representing the State]: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: Depending upon where I'm at.

BY MR. HODGE [representing Shipp]:

Q.   On a traffic stop?

A.   Correct.

Q.   Turn signal violation, depending upon location, you -- you go into people's pockets?

A.   Yes.

Q.   Okay.   Do you always detain those people in a –   in some manner before remov- -- or after removing that identification?

MR. PARKER: I'm going to have to object to that, Your Honor. It's highly speculative on every occasion that -- the officer's made thousands of stops –

THE COURT: Overruled.

THE WITNESS: Could you ask your question again, sir?

MR. HODGE: Yes.

BY MR. HODGE:

Q. Do you always detain those people that you remove -- that you personally remove identification from until you can verify identification?

A. Yes, generally that's what I do.

Q. You don't leave them in their own vehicles?

A. Depending upon where I'm at, I may or may not leave them in their vehicle.

Q. All right. Well, clarify for me then just where you're at? For instance, do you -- do you -- give me a location where you do not go into someone's pockets and take out his ID or her ID out of her -- or purse, I guess, and detain them while you verify the ID? Just tell me a location in Dayton where you don't do that?

A. (Indiscernable) --

MR. PARKER: Objection, Your Honor, I believe it's irrelevant.

MR. HODGE: The jail. At the jail.

MR. PARKER: Objection, Your Honor.

THE COURT: Overruled.

BY MR. HODGE:

Q. That's what your answer was -- the jail?

Is there any street location in Dayton where you don't do that?

A. Again, it's going to depend upon where -- where I am at.

Q. Okay. West Dayton.

A. Third and Broadway.

Q. Third and Broadway, you do not stop peo- -- I mean, you do not search people yourself, they take out their own ID.

A. Dependent -- it completely depends upon what the traffic stop is, the surrounding circumstances of it are, my location, time of day, whether or not the person's the owner of the car or not.

{¶ 17}  With police officer Cairns, the State was able to elicit testimony concerning the high-crime nature of the area of the stop (Tr. 53-54):

Q. Officer Cairns, are you familiar with this area that you're in?

A. Yes.

Q. And how so?

A. I used to work that area for about four years when I first came out of Police Academy.

Q. How would you describe that area?

A. That particular bar, there's lots of instances of fights and guns being dealt with. Basically crime, a lot of crime in that area.

Q. Are you familiar with any recent crimes that have taken place there?

A. Yes, I believe there was actually a homicide at that particular bar last week, a week and a half ago perhaps.

Q. Have you made many arrests in that area?

A. Yes.

{¶ 18} In order to conduct a lawful weapons pat-down, a police officer must have a reasonable suspicion that the person the officer is patting down may be armed and dangerous. In the case before us, the only reason established by the evidence for Officer Zwiesler's suspicion that Shipp might have a weapon in the pants pocket from which Officer Zwiesler retrieved Shipp's wallet was the criminal character of the neighborhood in which the stop occurred. We have rejected the high-crime nature of an area as a reason, in and of itself, justifying a pat-down. *State v. Habel*, 190 Ohio App.3d 393, 2010-Ohio-3907, 942 N.E.2d 389, ¶ 24-25 (2d Dist.). *See also State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300, ¶ 18: "We emphasize that an officer must have a reasonable *individualized* suspicion that the suspect is armed and dangerous before he may conduct a patdown for weapons." (Emphasis sic.)

{¶ 19} Here, Officer Zwiesler had no individualized suspicion that Shipp might be armed and dangerous. Neither the traffic violation for which Shipp was stopped (turning without signaling is routinely committed by motorists every day) nor anything Shipp did after he was stopped supported a reasonable suspicion that Shipp might be armed and dangerous. The only reason offered for that suspicion was the high-crime nature of the location, and that

is not sufficient, without other reasons.

{¶ 20}   Notwithstanding the lack of a reasonable suspicion that Shipp might be armed and dangerous, Officer Zwiesler was aware of information establishing probable cause for an arrest.   When Officer Zwiesler asked Shipp for his driver's license, Shipp "stated that he didn't have his license, but he did have a [sic] identification card."   Tr. 8.   R.C. 4507.35(A) provides:

> The operator of a motor vehicle shall display the operator's driver's license, or furnish satisfactory proof that the operator has a driver's license, upon demand of any peace officer or of any person damaged or injured in any collision in which the licensee may be involved. * * * A person's failure to furnish satisfactory evidence that the person is licensed under this chapter when the person does not have the person's license on or about the   person's person shall be prima-facie evidence of the person's not having obtained a driver's license.

{¶ 21}   Shipp's failure to furnish a driver's license to Officer Zwiesler constituted prima facie evidence that Shipp had not obtained a driver's license.   R.C. 4507.35(A).   Shipp stated that he did not have a license but had an identification card.   R.C. 4507.52(A) provides, in part:

> (A) Each identification card issued by the registrar of motor vehicles or a deputy registrar shall display a distinguishing number assigned to the cardholder, and shall display the following inscription:
>
> "STATE OF OHIO IDENTIFICATION CARD

This card is not valid for the purpose of operating a motor vehicle. It is provided solely for the purpose of establishing the identity of the bearer described on the card, who currently is not licensed to operate a motor vehicle in the state of Ohio."

**{¶ 22}** R.C. 4507.50(A) provides, in part:

The registrar of motor vehicles or a deputy registrar, upon receipt of an application filed in compliance with section 4507.51 of the Revised Code by any person who is a resident or a temporary resident of this state and, except as otherwise provided in this section, is not licensed as an operator of a motor vehicle in this state or another licensing jurisdiction, and, except as provided in division (B) of this section, upon receipt of a fee of three dollars and fifty cents, shall issue an identification card to that person.

**{¶ 23}** In short, a person cannot have both an identification card and a driver's license. In order to be issued an identification card, the person requesting the card cannot have a driver's license. R.C. 4507.50(A). Therefore, when Shipp stated that he did not have a license, but had an identification card, Officer Zwiesler had probable cause for an arrest of Shipp for operating a motor vehicle without a valid driver's license. *Jackson v. City of Gahanna*, 752 F. Supp.2d 830, 838 (S.D. Ohio 2010). Shipp concedes that "[t]he traffic violations – both turn signal use and lack of a valid license – are sufficient to justify the stop and ultimately, the arrest." Brief, p. 11.

**{¶ 24}** One of the exceptions to the general prohibition against warrantless searches is a search incident to a lawful arrest. *Chimel v. California*, 395 U.S. 752, 762-63, 89 S. Ct.

2034, 23 L.Ed.2d 685 (1969). "When conducting a search incident to arrest, police are not limited to a *Terry* pat-down for weapons, but may conduct a full search of the arrestee's person for contraband or evidence of a crime." *State v. Gagaris*, 12th Dist. Butler No. CA2007-06-142, 2008-Ohio-5418, ¶ 16 (Citations omitted.) *See also State v. Jones*, 112 Ohio App.3d 206, 215, 678 N.E.2d 285 (2d Dist.1996).

{¶ 25} "If probable cause to arrest without a warrant exists prior to a search, it is immaterial that the search incident to arrest actually precedes the arrest. * * * The key is the prior existence of probable cause, and that the fruit of the search not provide the justification for the arrest." *State v. Haines*, 12th Dist. Clermont No. CA2003-02-015, 2003- Ohio-6103, ¶17.

{¶ 26} Before Officer Zwiesler searched Shipp and retrieved the wallet from his pocket, Shipp had informed Officer Zwiesler that Shipp did not have a driver's license but instead had an identification card. At that moment, Officer Zwiesler had probable cause to arrest Shipp. Therefore, Officer Zwiesler's search of Shipp's person and ultimate retrieval of Shipp's wallet was lawful as a warrantless search incident to an arrest.

## B. Dayton's Tow Policy

{¶ 27} Warrantless searches are considered per se unreasonable under the Fourth Amendment, subject to only a few specifically established and well delineated exceptions. *City of Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988). An inventory search is one exception, and "permits police to conduct a warrantless search of a vehicle in order to inventory its contents after the vehicle has been lawfully impounded." *State v.*

*Clancy*, 2d Dist. Montgomery No. 18844, 2002-Ohio-1881, citing *State v. Mesa*, 87 Ohio St.3d 105, 108-109, 717 N.E.2d 329 (1999).

{¶ 28} Shipp contends that the Dayton Police Department's Tow Policy leaves the decision to tow "to the officer's open-ended discretion" and, therefore, "any search incident to that situation is unlawful and the fruits of the search must be suppressed." Brief, p. 15. We do not agree.

{¶ 29} A copy of the Dayton Police Department's Tow Policy was submitted to the trial court as Joint Exhibit 1. The Tow Policy states a preference for towing vehicles operated by drivers who do not have an operator's license. Furthermore, the Tow Policy provides that an inventory of the vehicle's contents should be performed prior to the towing of the motor vehicle.

{¶ 30} In *State v. Robinson*, 2d Dist. Montgomery No. 23175, 2010-Ohio-4533, we rejected a similar argument that the City of Dayton Police Department's tow policy "gives police officers too much discretion in deciding when they should tow vehicles." *Id.* at ¶ 1. In *Robinson,* we discussed a number of cases, including *State v. Bozeman*, 2d Dist. Montgomery No. 19155, 2002-Ohio-2588, which Shipp relies on in arguing that the evidence of the firearm must be suppressed. As we explained in *Robinson*, however, *Bozeman* "does not control our decision, because it involved a situation that was not covered by the tow policy at all, and there were no factors that informed the officer's discretion whether to tow vehicles." *Robinson* at ¶ 45.

{¶ 31} Moreover, after our holding in *Bozeman*, the Supreme Court addressed the issue of discretion in police department's towing policies in *Blue Ash v. Kavanaugh*, 113 Ohio

St.3d 67, 2007-Ohio-1103, 862 N.E.2d 810. "[A]s interpreted by the Supreme Court of Ohio in *Blue Ash*, if an officer is expressly authorized to use discretion in deciding whether to impound a vehicle, the pertinent inquiry is whether the impoundment was merely a pretext for an evidentiary search." *Robinson* at ¶ 52.

**{¶ 32}** The Dayton Police Department Tow Policy provides police officers with discretion in determining whether vehicles should be impounded. There is no evidence in the record that the decision to tow Shipp's vehicle was a pretext for an evidentiary search. The impoundment, therefore, was lawful. Also, even if the Police Department's inventory policy was violated when Shipp's locked glove compartment was forced open, by that time there was an independent basis for the search – Shipp's voluntary statements that there was a gun in the glove compartment. *Id.* at ¶ 53-56 (Citation omitted.) As Shipp concedes, "[i]f there is probable cause to search, it makes no difference if the glove box is open, closed, or even locked." Brief, p. 17.

### C. Shipp's Volunteered Statements

**{¶ 33}** Once a law enforcement officer has probable cause to believe that a vehicle contains contraband or other evidence that is subject to seizure, he may search a validly stopped motor vehicle based upon the well-established automobile exception to the warrant requirement. *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S. Ct. 2013, 144 L.Ed.2d 442 (1999); *State v. Mills*, 62 Ohio St.3d 357, 367, 582 N.E.2d 972 (1992). When probable cause is found to exist under the facts and circumstances of a given case, law enforcement officers have the necessary constitutional justification to explore any areas in the vehicle, such as

locked trunks and glove compartments that may reasonably contain the object of their search. *United States v. Ross*, 456 U.S. 798, 809, 102 S. Ct. 2157, 72 L.Ed.2d 572 (1982); *State v. Welch*, 18 Ohio St.3d 88, 92, 480 N.E.2d 384 (1985).

{¶ 34} Shipp contends that the State cannot show by a preponderance of the evidence that he made statements about the gun in the glove compartment prior to the time that the police officers opened the glove compartment and discovered the gun. We do not agree. Detective Chad Knight arrived on the scene while the officers were inventorying Shipp's vehicle. While Detective Knight was standing by the back door of the cruiser, Shipp began yelling from inside the cruiser. Detective Knight testified as follows regarding what he heard (Tr. 62):

> I was standing by the back door. The occupant in the back seat of the cruiser obviously was visibly upset seeing the guys search his car. He started yelling, "You can't search my car. You can't -- you don't have a warrant. You need a warrant. You can't search my car." And he started yelling at a girl that was by the back door and, "Baby, they tryin' to charge me with this." And you know, "They can't search my car. They tryin' to charge me with some gun." And you know, "They can't do that -- you can't charge me with that gun. That's a locked glove box and it's locked up. You can't charge me." To that effect.

{¶ 35} Officer Zwiesler, who was inventorying the car, did not hear Shipp yelling from inside the police cruiser. Officer Zwiesler testified as follows regarding when he made the decision to search the glove compartment (Tr. 11):

> Q At any time had you searched the glove box?

A Not until I was advised by Detective Knight and Officer Cairns that I should probably check the glove box.

Q And what were you advised.

A That there was a gun in there.

Q Did the officers tell you what the defendant had stated?

A Yes, they had.

Q What did they say?

A I was advised that Mr. Shipp had begun yelling that it was an illegal search of his car and that he couldn't be charged with a gun in the glove box, because it was locked.

Q And, again, prior to hearing that statement, had you searched the glove box yet?

A No, I had not.

{¶ 36} Officer Cairns also testified that the glove compartment was searched after Detective Knight informed him and Officer Zwiesler that Shipp had made reference to a gun in the glove compartment. Tr. 51, 53.

{¶ 37} The testimony of record supports the finding that the police officers did not search the glove compartment until after Shipp made voluntary statements about a gun in the glove compartment. Consequently, at the time the police officers searched the glove compartment, they had probable cause to believe that the glove compartment contained a firearm, which made their warrantless search of the locked glove compartment lawful.

{¶ 38} Shipp's sole assignment of error is overruled.

## IV.   Conclusion

{¶ 39}   Shipp's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

GRADY, P.J., and HALL, J., concur.

Copies mailed to:

Michele D. Phipps
Mathias H. Heck
Richard A. Nystrom
Hon. Steven K. Dankof