[Cite as *State v. Taylor*, 2013-Ohio-814.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

      Plaintiff-Appellee

v.

NATHAN TAYLOR, JR.

      Defendant-Appellant


Appellate Case No.   25169

Trial Court Case No. 11-CR-2466

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the    8th    day of       March      , 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JOSEPH R. HABBYSHAW, Atty. Reg. #0089530, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

PAMELA L. PINCHOT, Atty. Reg. #0071648, 7960 Clyo Road, Dayton, Ohio 45459
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1}    Defendant-Appellant, Nathan Taylor, appeals from his conviction and sentence on one count of possession of crack cocaine in an amount equaling or exceeding one gram but less than five grams, in violation of R.C. 2925.11(A).   Taylor contends that the trial court erred in overruling his motion to suppress, because the police did not have reasonable grounds to conduct a pat-down.   Taylor further contends that the pat-down exceeded permissible boundaries and violated his rights under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

{¶ 2}    We conclude that the trial court did not err in overruling the motion to suppress evidence.   The police officer who conducted the search had individualized reasonable grounds to conduct a pat-down of Taylor, and the pat-down also did not exceed the permissible scope of such searches.   Alternatively, the officer who conducted the pat-down had probable cause to arrest Taylor and could have conducted a warrantless search incident to the arrest.    Accordingly, the judgment of the trial court will be affirmed.

I.  Facts and Course of Proceedings

{¶ 3}    In October 2011, Nathan Taylor was indicted for possession of crack cocaine in an amount equaling or exceeding one gram, but less than five grams.   Taylor filed a motion to suppress evidence, and the trial court held a hearing, at which the following evidence was elicited from Dayton Police Officer David House, who was the sole witness at the hearing.

{¶ 4}    Officer House has been a police officer for the City of Dayton for more than

twenty years. Before returning to street patrol in July 2010, House had worked in the Special Investigations Unit for thirteen years as a narcotics detective. On July 13, 2011, House was assigned to the Third District, which consists of the southwest part of Dayton. He normally worked from 11:00 p.m. to 7:00 a.m.

{¶ 5} At some point during the evening of July 12, Officers Eric Kleinhans and Jerry Bell received information from a subject concerning the fact that two males were selling drugs in the area of Nathan's Superette, which was a small market on Delphos Avenue in Dayton, Ohio. No specific description of the men was provided, other than their race, but the car they were driving was described and was distinctive. The car was described as a 1990's model, black Chevrolet Camaro, with white racing stripes.

{¶ 6} House was patrolling that evening and received the message about the alleged drug dealers at about 1:10 a.m. on July 13. House drove to the area around Delphos Avenue, which was known as a high drug area. House drove up and down the streets in the neighborhood, but did not have any luck locating the car. While House was still in the area, he received a radio contact from Officer Simison. Upon ascertaining where House was located, Simison said that a black Chevrolet Camaro with white racing stripes had just "ducked" or had just lost Simison after failing to signal a turn at the corner of Second Street and Delphos Avenue. Simison further said that he had subsequently located the vehicle parked on Kammer Avenue, which was in the area, and had seen two individuals walking away from the vehicle, but going in different directions. One individual (later identified as Dolas Palmer-Baker), had gotten out of the driver's side, and the other (later identified as Taylor), had exited from the passenger's side. Both subjects matched the race of the men described in the tip.

**{¶ 7}** At the time, House was parked close by, at the intersection of Kammer and Westwood Avenues. House drove past the Camaro and saw it parked on Kammer. After driving past the car, House turned northbound on Walton Avenue, and spotted an individual (later identified as Taylor), walking northbound on the sidewalk, talking on his cell phone. House contacted Simison and verified that the description of the individual matched the person that Taylor had seen exiting from the passenger's seat of the Camaro.

**{¶ 8}** Simison told House that he would take a position on foot where he could continue to watch the Camaro. Shortly thereafter, Taylor and Palmer-Baker met back up at the Camaro. About five to seven minutes elapsed between the time House had first seen Taylor and the time that the two suspects came back to the Camaro. House was able to keep Taylor in sight for a good portion of this time, and it appeared that Taylor basically circled the block before returning to the car.

**{¶ 9}** House relayed his observations to Simison, and took a position at Hoover and Westwood Avenues. When the men returned to the Camaro, Simison informed House. Simison also said that the Camaro had begun traveling eastbound on Kammer, with the headlights off. The Camaro then turned right onto Westwood Avenue, and Simison reported that he could no longer see the car. However, House was located about a block away and saw the Camaro traveling on Westwood, again, with the headlights still off. The headlights of the Camaro were then turned on, and it made a left turn. House quickly caught up with the Camaro and initiated a traffic stop, based on the initial offense that Simison had seen, the elusive activities that had occurred in connection with ditching the car and then coming back to the car, and the traffic violation of driving without headlights.

{¶ 10}    House radioed the location of the stop to Simison and to dispatch.  He then exited his cruiser and approached the Camaro.  House could not see into the car because  it had very dark tinted windows.  The driver's side window was cracked only a few inches, and House opened the driver's door for his safety, so that he could see into the vehicle while talking to the occupants.

{¶ 11}    House asked the driver, who turned out to be Taylor, if the car belonged to him. Taylor said no, and could not identify the owner of the car.  House asked Taylor to step out of the car, and also asked the passenger, Palmer-Baker, to keep his hands on the dashboard.  As Taylor stepped out of the car, he stated that he did not have a driver's license.  Because House was the only officer on the scene, had two individuals in the car, had reason to believe the individuals were possibly involved in drug sales, and had heard Taylor say that he had no driver's license, House secured Taylor in handcuffs and patted Taylor down.  House indicated this was for his own safety.

{¶ 12}    House handcuffed Taylor's hands behind his back.  During the pat-down, House felt a hard, rock-like substance near the area of Taylor's buttocks.  House had conducted thousands of pat-downs and immediately recognized the material to be illegal narcotics.  House did not tell Taylor what he found, but continued the pat-down to make sure Taylor did not have any weapons.  He then instructed Taylor to sit on the curb while he made contact with the passenger (Palmer-Baker).  At that time, Simison had arrived.  As House began to escort Palmer-Baker to his cruiser, Palmer-Baker stated that he knew that he had a warrant outstanding.

{¶ 13}    After placing Palmer-Baker in the cruiser, House read Taylor his *Miranda*

rights, and then asked Taylor about the narcotics in his pants. After first denying that he had narcotics, Taylor admitted that he had narcotics. House and Simison then recovered a plastic baggie containing about one and one-half grams of crack cocaine.

{¶ 14} House testified that, in his experience, there is a correlation between weapons and drug activity, particularly with individuals who are suspected of selling drugs. These individuals are commonly armed. House also stated that Taylor could have had access to a weapon, despite the fact that his hands were handcuffed behind his back. House indicated that a police officer had been stabbed and killed in another state in the last month by a prisoner who had been able to get out of handcuffs while being transported to jail.

{¶ 15} When questioned about how he patted Taylor down in the area of the buttocks, House stated that he used the side of his hand and basically pressed it between the cheeks of Taylor's buttocks. According to House, although he had not personally recovered a weapon in someone's buttocks, another officer from Dayton had recovered a handgun from that location. House also related being aware of other incidents nationwide where officers had recovered weapons from that area of a suspect's body.

{¶ 16} After hearing the evidence, the trial court overruled the motion to suppress. The court concluded that the stop was appropriate and that the pat-down was appropriate for officer safety. Taylor pled no contest after the suppression motion was overruled, was found guilty of the crime as charged, and was sentenced to community control sanctions for a period of up to five years. Taylor appeals from his conviction and sentence.

II. Were there Reasonable Grounds for the Pat-Down?

**{¶ 17}** Taylor's first assignment of error is as follows:

The trial court erred in overruling Defendant-Appellant's motion to suppress as the Dayton police officer did not have reasonable grounds to pat-down Defendant-Appellant and, therefore, violated the rights guaranteed to Defendant-Appellant by the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

**{¶ 18}** Under the first assignment of error, Taylor contends that Officer House did not have reasonable grounds for believing that Taylor was armed and dangerous. Taylor points to the lack of description of the men allegedly selling drugs, the fact that House did not observe Taylor doing anything other than talking on his cell phone, the fact that no guns or drugs were in plain view, and the fact that House did not observe any furtive movements by Taylor or his passenger.

**{¶ 19}** The standards for reviewing decisions on suppression motions are well-settled. In ruling on motions to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1972). Thus, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

**{¶ 20}** In *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300, ¶ 14, we

noted that:

> The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Martin*, Montgomery App. No. 20270, 2004-Ohio-2738, at ¶ 10, citing *Terry, supra*; *State v. Molette*, Montgomery App. No. 19694, 2003-Ohio-5965, at ¶ 10. A police officer may lawfully stop a vehicle, motorized or otherwise, if he has a reasonable articulable suspicion that the operator has engaged in criminal activity, including a minor traffic violation. See *State v. Buckner*, Montgomery App. No. 21892, 2007-Ohio-4329, ¶ 8.

**{¶ 21}** Once an officer initiates a lawful stop, "a limited protective search of the detainee's person for concealed weapons is justified only when the officer has reasonably concluded that 'the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others* * *.' " *State v. Evans,* 67 Ohio St.3d 405, 408, 618 N.E.2d 162 (1993), quoting from *Terry*, 392 U.S. at 24. *Accord*, *State v. Shipp*, 2d Dist. Montgomery No. 24933, 2012-Ohio-6189, ¶ 18.

**{¶ 22}** The high-crime nature of an area is not itself a reason justifying a pat-down; instead, the officer must have a " 'reasonable *individualized* suspicion that the suspect is armed and dangerous.' " (Emphasis sic.) *Shipp* at ¶ 18, quoting *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300, ¶ 18.

{¶ 23} In *Shipp*, we concluded that the police officer did not have a reasonable individualized suspicion, because the violation was a routine traffic infraction that motorists commit daily, and nothing the defendant did after the stop supported a reasonable suspicion that he might be armed and dangerous. *Id.* at ¶ 19. In fact, the only reason given was the high-crime nature of the location. *Id.*

{¶ 24} The circumstances in the case before us demonstrate that Officer House had a reasonable individualized suspicion that Taylor was armed and dangerous. Although House indicated the location was a high drug area, that was not the only basis for his suspicion. As noted, House had received a report that individuals driving a car of the same unique description were suspected of selling drugs from the car. House was very experienced in narcotics investigation, and stated that people selling drugs are usually armed. The two men in the car had also acted suspiciously, by eluding an officer, driving to a location where they left the car, walked around the block in the early morning hours without any apparent destination, and then drove the car down the street without turning on the headlights. These activities suggest that the defendants were engaged in criminal activity, and might be armed and dangerous. In contrast, the arresting officer in *Shipp* had no prior knowledge about the defendant, and simply stopped him for a minor traffic infraction. *Shipp,* 2d Dist. Montgomery No. 24933, 2012-Ohio-6189, at ¶ 3 and 15.

{¶ 25} Accordingly, we conclude that Officer House had a reasonable individualized suspicion that Taylor was armed and dangerous, and the pat-down search was justified on that basis. Taylor's first assignment of error is overruled.

### III. Did the Scope of the Pat-down Exceed Permissible Boundaries?

**{¶ 26}** Taylor's second assignment of error states as follows:

The trial court erred in overruling Defendant-Appellant's motion to suppress as the Dayton police officer's pat-down of Defendant-Appellant exceeded permissible boundaries and, therefore, violated the rights guaranteed to Defendant-Appellant by the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

**{¶ 27}** Under this assignment of error, Taylor contends that Officer House was searching for contraband rather than a weapon, and that the scope of his search exceeded the permissible scope of a Terry search when he placed his finger between Taylor's buttocks.

**{¶ 28}** In arguing that the search was permissible, the State relies on two prior cases from our district that the State claims are analogous. The first case, *State v. Allen*, 2d Dist. Montgomery No. 22663, 2009-Ohio-1280, involved a situation in which an arresting officer found crack cocaine between the cheeks of the defendant's buttocks while patting the defendant down for weapons. *Id.* at ¶ 10. However, the officer testified that he was not required to reach between the cheeks of the defendant's buttocks; instead, it was an "outside pat of the buttocks." *Id.* at ¶ 43. The officer also testified that "The actual rock was protruding where it was stuck out. Not that you could see it with the naked eye to look, but all you had to do is just put your hand on it (indicating) and you feel it sticking out." *Id.* at ¶ 42.

**{¶ 29}** We noted in *Allen* that:

We have, on several occasions, expressed concern over the intrusiveness of a search of the area between an individual's buttocks. *E.g.*, *State v. Barnett*,

Montgomery App. No. 21619, 2007-Ohio-3694, ¶ 19; *State v. Mackey* (2001), 141 Ohio App.3d 604. Trial courts should view such situations closely, if not skeptically. However, Mullins' testimony, which was credited by the trial court, established that his search of Allen did not rise to that level of intrusiveness. Mullins' search for weapons was limited to the exterior of Allen's clothing, and Mullins did not search between the crack of Allen's buttocks. Based on the record, Mullins' patdown did not exceed the permissible scope of a *Terry* patdown. *Allen* at ¶ 45.

**{¶ 30}** The second case the State relies on is *State v. Gillis*, 2d Dist. Montgomery No. 21868, 2007-Ohio-3456, which involved the same officer who conducted the search in the case before us. In *Gillis*, Detective House placed the defendant in handcuffs because he believed the defendant had been involved in drug activity, and a knife had already been found on the defendant's person. *Id.* at ¶ 21. House also stated that:

"I completed the patdown and I checked the area between Mr. Gillis' buttocks, and as I did that I felt a hard object which was between the actual cheeks of his buttocks, which is a common hiding place for narcotics. And when I felt this, I recognized it to be what I suspected it to be as crack cocaine. *Id.*

**{¶ 31}** House further testified that once he had touched the object with his hand, Gillis clenched his buttocks together in an attempt to prevent House from being able to feel the object. *Id.* at ¶ 22. We concluded that the investigatory stop and search were permissible, noting that "[t]he discovery of one weapon and the confirmed drug activity warranted additional precaution and concern for officers' safety." *Id.* at ¶ 66. We also stressed that "[a]lthough weapons may

not commonly be located in the buttocks area, some legitimate concern was established by the testimony adduced herein." *Id.*

**{¶ 32}** We additionally concluded in *State v. McBeath*, 2d Dist. Montgomery No. 23929, 2010-Ohio-3653, that a search did not exceed the permissible scope for a pat-down. We noted that "[t]he patdown for weapons was limited to the exterior of McBeath's clothing. Godsey used a flat hand, and she did not search between the crack of McBeath's buttocks." *Id.* at ¶ 31.

**{¶ 33}** Based on the preceding discussion, we conclude that the scope of the pat-down did not exceed permissible bounds. Officer House testified that he is aware of instances, including a situation involving a fellow officer, where weapons have been found in the cheeks of the buttocks. House also used the flat of his hand, and his search was not unduly intrusive.

**{¶ 34}** Alternatively, the search was appropriate as incident to a lawful arrest. When Officer House first approached the vehicle, Taylor could not furnish the name of the owner of the car that he was driving. When House asked Taylor to step out of the car, Taylor stated that he had no driver's license. House indicated at the suppression hearing that driving without a license is an arrestable offense, and is a first degree misdemeanor.

**{¶ 35}** In *Shipp*, 2d Dist. Montgomery No. 24933, 2012-Ohio-6189, ¶ 24-25, we stated that:

> One of the exceptions to the general prohibition against warrantless searches is a search incident to a lawful arrest. *Chimel v. California*, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). "When conducting a search incident to arrest, police are not limited to a *Terry* pat-down for weapons, but may

conduct a full search of the arrestee's person for contraband or evidence of a crime." *State v. Gagaris*, 12th Dist. Butler No. CA2007-06-142, 2008-Ohio-5418, ¶ 16 (Citations omitted.) See also *State v. Jones*, 112 Ohio App.3d 206, 215, 678 N.E.2d 285 (2d Dist.1996).

"If probable cause to arrest without a warrant exists prior to a search, it is immaterial that the search incident to arrest actually precedes the arrest. * * * The key is the prior existence of probable cause, and that the fruit of the search not provide the justification for the arrest." *State v. Haines*, 12th Dist. Clermont No. CA2003-02-015, 2003-Ohio-6103, ¶ 17.

**{¶ 36}** We concluded in *Shipp* that an officer did not have an individualized suspicion that the defendant was armed and dangerous when he stopped the defendant for a routine traffic violation, because the only reason given for frisking the defendant was that the area was a high-crime location. *Id.* at ¶ 19. However, we concluded that the officer did have probable cause to arrest the defendant and to perform a search incident to an arrest based on the defendant's comment that he had a state identification card. We noted that a person possessing a state identification card cannot have a driver's license. *Id.* at ¶ 23. Thus, at that moment, the officer had probable cause to arrest for the offense of driving without a license, and could lawfully conduct a warrantless search incident to the arrest. *Id.* at ¶ 26.

**{¶ 37}** Similarly, at the moment Officer House learned that Taylor did not have a driver's license, House had probable cause to arrest Taylor and could have lawfully conducted a warrantless search incident to the arrest.

**{¶ 38}** Accordingly, the second assignment of error is without merit and is overruled.

## IV. Conclusion

{¶ 39}    All of Taylor's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FAIN, P.J. and FROELICH, J., concur.

Copies mailed to:

Joseph R. Habbyshaw
Pamela L. Pinchot
Hon. Gregory F. Singer