[Cite as *State v. Fleming*, 2022-Ohio-1876.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-40 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-416 |
| | : | |
| JAMAL FLEMING | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of June, 2022.

. . . . . . . . . .

IAN A RICHARDSON, Atty. Reg. No. 0100124, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

ADAM JAMES STOUT, Atty. Reg. No. 0080334, 5335 Far Hills Avenue, Suite 109, Dayton, Ohio 45429
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} After a jury trial in the Clark County Court of Common Pleas, Jamal Fleming was found guilty of aggravated trafficking in drugs (methamphetamine), aggravated possession of drugs (methamphetamine), trafficking in cocaine, and possession of cocaine. After merging the possession and trafficking charges, the trial court imposed consecutive sentences totaling 30 months in prison.

{¶ 2} Fleming appeals from his conviction, claiming that the trial court erred in overruling his pretrial motion to suppress, that his convictions for aggravated trafficking in drugs and trafficking in cocaine were based on insufficient evidence and against the manifest weight of the evidence, and that the court erred in allowing the State to present Facebook Messenger texts at trial. For the following reasons, the trial court's judgment will be reversed, and the matter will be remanded for resentencing on the possession offenses.

## I. Facts and Procedural History

{¶ 3} On April 15, 2020, Springfield police officers observed Fleming driving his girlfriend's Chevy Equinox. After confirming through LEADS (a state law enforcement database) that Fleming did not have a valid license, Officer Tim Melvin initiated a traffic stop and arrested Fleming on an active warrant for driving under suspension. The officer searched Fleming and felt a hard crystal-like substance. A small baggie containing that substance fell down the leg of Fleming's pants and onto the ground. Lab testing revealed that the baggie contained approximately 1.08 grams of methamphetamine and 0.33 grams of cocaine.

{¶ 4} As a result of a prior unrelated incident, Detective Justin Allender was investigating Fleming for drug trafficking. Allender became aware of a Facebook account with the profile name "Flipp Royal," which he believed Fleming was using. Allender obtained a search warrant for the account and reviewed messages from March 2020 which were indicative of drug trafficking in cocaine, crystal meth, heroin, fentanyl, and marijuana.

{¶ 5} Fleming was indicted on aggravated trafficking in drugs (methamphetamine), a fourth-degree felony; aggravated possession of drugs (methamphetamine), a fifth-degree felony; trafficking in cocaine, a fifth-degree felony; and possession of cocaine, a fifth-degree felony. The date of the offense for all charges was April 15, 2020.

{¶ 6} Fleming moved to suppress the evidence obtained as a result of his stop and seizure on April 15. He claimed that the police had lacked reasonable suspicion of criminal activity to justify the stop. After a hearing, the trial court overruled the motion.

{¶ 7} The matter proceeded to a one-day jury trial during which the State presented four witnesses and offered four exhibits, including Facebook messages from the account purportedly used by Fleming. Fleming testified in his own defense. The jury found Fleming guilty of each offense. The court merged the trafficking and possession offenses and sentenced him to 18 months in prison for aggravated trafficking in drugs (Count 1) and 12 months in prison for trafficking in cocaine (Count 3), to be served consecutively.

{¶ 8} Fleming appeals from his convictions, raising four assignments of error. We will address them in an order that facilitates our analysis.

## II. Motion to Suppress

{¶ 9} In his third assignment of error, Fleming claims that the trial court erred in finding that the Springfield police officer had reasonable suspicion to stop the vehicle that he was driving.

{¶ 10} The weight of the evidence and the credibility of the witnesses at a suppression hearing are primarily for the trial court to determine. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 58; *State v. Moore*, 2d Dist. Montgomery No. 29143, 2022-Ohio-283, ¶ 8. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 11} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Whether a stop and search is reasonable under the Fourth Amendment depends upon the particular facts and circumstances, viewed objectively by examining the totality of the circumstances. *See State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 14.

{¶ 12} Police officers may briefly stop and temporarily detain individuals to

investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity has occurred, is occurring, or is about to occur. *Terry*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8; *State v. Laster*, 2d Dist. Montgomery No. 27762, 2018-Ohio-3601, ¶ 49. Reasonable suspicion of any criminal offense, even a minor traffic-related offense, is sufficient to justify an investigatory detention. *See, e.g., Mays* at ¶ 8 (stop based on reasonable suspicion of a traffic violation is constitutionally valid).

{¶ 13} We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." (Citation omitted.) *Kansas v. Glover*, __ U.S. __, 140 S.Ct. 1183, 1187, 206 L.Ed.2d 412 (2020).

{¶ 14} In this case, Officers Tim Melvin and Joshua Lish of the Springfield Police Department testified at the suppression hearing on behalf of the State. Their evidence established that on April 15, 2020, Officer Melvin ran the license plate of a black Chevy Equinox behind which he was driving on John Street in Springfield. The plate came back to a woman that Melvin knew to be Fleming's girlfriend. Looking through the vehicle's rear window, Officer Melvin saw that the driver was taller and had long dreadlocks, and

he was suspicious that Fleming might be the driver. (Officer Melvin had encountered Fleming a couple of times a month or two earlier.) Melvin ran Fleming's information through LEADS and learned that Fleming did not have a valid driver's license. Officer Melvin asked Officers Lish and Williams Sanders, who were nearby in another police vehicle, to confirm the identity of the driver.

{¶ 15} Officer Lish pulled his marked Chevy Tahoe to the right side of the Equinox, which was stopped at a red light. The vehicles were approximately three or four feet apart, and the weather was sunny and clear. When asked if the windows of the Equinox were tinted, Lish did not recall. Officer Melvin stated that the Tahoe probably sat a little higher than the Equinox.

{¶ 16} Officer Lish looked over at the Equinox for about five seconds and saw that Fleming was driving it. He recognized Fleming from their five or six prior interactions, of which three or four had occurred within the past year. Fleming looked the same as he had during those prior encounters. According to Officer Lish, Officer Sanders agreed with the identification. Officer Lish communicated to Officer Melvin that Fleming was driving the Equinox, and Officer Melvin initiated a traffic stop.

{¶ 17} As Officer Melvin approached Fleming, the dispatcher informed him that Fleming had an active warrant for driving under suspension. Melvin arrested Fleming on the warrant and conducted a search incident to the arrest. During the search, Melvin felt a hard rock substance between Fleming's buttocks. The substance fell down Fleming's pant leg to the ground. The officer saw that the object was a crystal-like hard substance.

{¶ 18} Fleming testified on his own behalf. He emphasized that the windows of

the Equinox were tinted, which would have made it difficult for the officers to view him inside the vehicle. He also testified that Officers Lish and Sanders were driving a police van, which sat almost two feet higher than the Equinox, and that Officer Sanders had previously confused him with his brother. As for the weather conditions, Fleming indicated that it had snowed earlier and the weather was starting to clear up. Fleming stated that he was "positive" that the officers could not have seen him.

{¶ 19} In denying Fleming's motion to suppress, the trial court concluded that Officer Melvin had had reasonable suspicion of criminal activity to justify the traffic stop. It found, in part: "Officer Melvin made the traffic stop on his partial identification, the positive identification of two other officers, and the fact that the vehicle involved was registered to the defendant's girlfriend, a fact that significantly narrowed the pool of potential drivers. The Court is not persuaded that the tinted windows or the point of view undermines their positive identification."

{¶ 20} We find no error in the trial court's ruling. All three Springfield police officers were familiar with Fleming from prior encounters. While driving along John Street, Officer Melvin discovered that the vehicle behind which he was driving was registered to Fleming's girlfriend, and he saw that the silhouette of the driver resembled Fleming. Melvin ran Fleming's information and learned that he did not have a valid driver's license.

{¶ 21} Before initiating a stop of the vehicle, Officer Melvin asked Officer Lish to confirm the identification of the driver. Lish testified that he drove beside the Equinox and confirmed, based on prior encounters, that Fleming was the individual driving the

vehicle. Although Fleming disputed that Officer Lish had been able to make that identification due to the tint of the Equinox's windows and the relative heights of the two vehicles, the trial court reasonably credited the officers' testimony, and we defer to that determination.

**{¶ 22}** Under the collective knowledge doctrine, Officer Melvin was permitted to rely on the information provided to him by the other officers in helping to develop reasonable suspicion to justify a stop of Fleming's vehicle. *See State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 30 (2d Dist.); *State v. Jones*, 2d Dist. Montgomery No. 23926, 2011-Ohio-1984, ¶ 20. Based on Officer Lish's confirmatory identification and information that Fleming did not have a valid license, Officer Melvin was justified in pulling over the Equinox to investigate.

**{¶ 23}** After initiating the traffic stop, the dispatcher informed Officer Melvin that Fleming was subject to a valid warrant for driving under suspension. Officer Melvin was entitled to arrest Fleming for his outstanding warrant and conduct a search incident to that arrest. "Pursuant to a search incident to arrest, the police may conduct a full search of the arrestee's person, and that search is not limited to the discovery of weapons, but may include evidence of a crime as well." *State v. Jones*, 112 Ohio App.3d 206, 215, 678 N.E.2d 285 (2d Dist.1996.) Officer Melvin lawfully found the drugs during such a search. Accordingly, the trial court did not err in denying Fleming's motion to suppress.

**{¶ 24}** Fleming's third assignment of error is overruled.

### III. Sufficiency of the Evidence

**{¶ 25}** In his fourth assignment of error, Fleming claims that his convictions were

based on insufficient evidence.

{¶ 26} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 27} We note that, in his first assignment of error, Fleming has challenged the trial court's admission of Facebook Messenger posts. In reviewing claims based on the sufficiency or manifest weight of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284; *State v. Lawson*, 2020-Ohio-6852, 164 N.E.3d 1130, ¶ 86 (2d Dist.); *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.). Accordingly, the outcome of that assignment of error has no bearing on whether the evidence at trial supported Fleming's convictions.

{¶ 28} Fleming was convicted of two counts of trafficking in drugs, in violation of R.C. 2925.03(A)(2). That statute provides that "[n]o person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled

substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person."

{¶ 29} "Circumstantial evidence has long been used to successfully support drug trafficking convictions." *State v. Batdorf*, 2d Dist. Greene No. 2020-CA-3, 2020-Ohio-4396, ¶ 16, citing *State v. Delaney*, 2018-Ohio-727, 106 N.E.3d 920, ¶ 11 (9th Dist.). For example, "the convergence of illegal drugs, drug paraphernalia (including baggies), and large sums of cash permit a reasonable inference that a person was preparing drugs for shipment." *Id.*, quoting *Delaney* at ¶ 11; *see also State v. Rutledge*, 6th Dist. Lucas No. L-12-1043, 2013-Ohio-1482, ¶ 15. Circumstantial evidence and direct evidence have the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶ 30} At trial, the State presented the testimony of four witnesses: Officers Melvin and Lish, Detective Allender, and Megan Snyder, a forensic scientist with the Ohio Bureau of Criminal Investigations (BCI). Officers Melvin's and Lish's testimony about their actions leading to the traffic stop was similar to their suppression hearing testimony. Officer Melvin added that he suspected that the substance in the baggie contained methamphetamine and he sent it to BCI for testing. He also testified that Fleming made unsolicited statements about the baggie after it fell out of his pant leg. Fleming reportedly said, "Okay, you got me, man. I'm a user. I'm just a user. That was my personal use. You got me."

{¶ 31} Officer Lish provided additional testimony that he and Officer Sanders

circled around and assisted with the traffic stop. Lish saw Officer Melvin search Fleming and the baggie of drugs fall out of Fleming's pant leg. After the drugs fell to the ground, Lish heard Fleming volunteer something along the lines of "That's something that I use." Both Officer Melvin and Officer Lish identified Fleming as the individual who was stopped and searched on April 15, 2020.

{¶ 32} Snyder testified that one item was submitted to BCI for analysis, but when she opened it, she noticed two different types of substances inside and, therefore, analyzed them separately. She determined that the crystalline substance weighed 1.08 grams, plus or minus 0.04 grams, and contained methamphetamine, a Schedule II controlled substance. That amount was less than the bulk amount of methamphetamine. The second item, an off-white solid substance, weighed 0.33 grams, plus or minus 0.04 grams, and contained cocaine.

{¶ 33} Detective Allender, a member of the Springfield Police Department Drug Unit, testified that he was trained on cell phone evidence recovery and the applications that are found on cell phones. He also stated that he was experienced in reviewing social media data to help with drug trafficking investigations. In March 2020, another detective learned that a person using a Facebook account with the profile name "Flipp Royal" had sold drugs to a homicide victim, and the detective passed the information along to Detective Allender for further investigation of the drug activity. Allender was familiar with Fleming and knew that "Flipp Royal" was a Facebook account that he likely was using.

{¶ 34} Detective Allender looked at profile photographs associated with the "Flipp Royal" account and recognized Fleming in those photographs. The account also listed

a date of birth, which was the same as Fleming's. After looking at conversations associated with the "Flipp Royal" account, Allender obtained a search warrant to search through the account. While waiting for a response from Facebook, Detective Allender learned that Fleming had been arrested with suspected drugs on his person on April 15.

{¶ 35} Detective Allender later received approximately 1,300 pages of data from Facebook. While going through those communications, Allender recognized the names of several drug users and drug dealers in the Springfield area, including Jeremy Barclay and Harley Leigh. He stated that the messages discussed multiple different types of drugs being sold and Flipp Royal was selling ounces and even grams of drugs. Detective Allender testified that a gram of methamphetamine was "probably just the standard user amount. It might be less," and that drug users often requested drugs in terms of dollar amounts, which would break down into tenths of a gram. The detective stated that it is common for drug traffickers to insist that drugs found on them are for their own personal use.

{¶ 36} Detective Allender was asked about two sets of Facebook Messenger exchanges involving Flipp Royal. The first set (State's Exhibit 3) consisted of a series of messages between Barclay and Flipp Royal between March 16 and March 29, 2020. The State focused on communications on March 22, when Barclay reached out to Flipp Royal and said that he needed "Hard. Ice. N boi," which Detective Allender translated to mean crack, crystal meth, and heroin or fentanyl. Flipp Royal indicated that he had them and asked how much Barclay wanted. Barclay replied, "Whats the ice look line n whats the ticket?" meaning what was the quality of the crystal meth and how much did it cost.

Flipp Royal said that he had enough and the quality was "fire," meaning more pure or excellent. Detective Allender testified that the comment "they say its fire" implied that Fleming relied on others to vouch for the quality of the drugs.

{¶ 37} Flipp Royal and Barclay had additional exchanges concerning quantities, price, and where to meet. Flipp Royal agreed to bring "2 gs" of marijuana, but Barclay later complained that he only had received one. Over the course of the day, the men communicated about additional drug transactions. Fleming offered to sell Barclay powder cocaine for $65, saying it was "fire." In other communications, Barclay stated he needed "boi" and "weed." Some of Flipp Royal's additional messages expressed anger that he had obtained drugs for Barclay from his supplier, but Barclay had not bought them. During this exchange, Flipp Royal pointed out to Barclay that he (Barclay) said he had "a dude to test it u was waiting to cum back."

{¶ 38} On March 24, 2020, Flipp Royal had a series of Facebook Messenger exchanges with Leigh. (State's Exhibit 4.) In those messages, Leigh negotiated to purchase drugs, including cocaine, from Flipp Royal to sell to other people. Several of the messages concerned small quantities of drugs. Leigh asked Flipp Royal to bring the drugs to her.

{¶ 39} On cross-examination, Detective Allender acknowledged that State's Exhibit 3 concerned messages that began on March 15, approximately a month prior to the traffic stop in which Fleming was found with drugs. When asked if drug trafficking communications planned that far ahead, the detective responded that it could for large amounts, but he had "never seen it" and it was "not likely" for the small quantities alleged

here. Detective Allender agreed that some of the back-and-forth between Flipp Royal and Barclay related to claims that Flipp Royal had not provided what Barclay had asked for. Allender indicated that he had requested Facebook messages before the April 15 incident, and the drugs discussed in the messages likely would have been gone by April 15.

{¶ 40} Detective Allender did not know Fleming to be a drug user based on his prior experience with him. Contrastingly, Allender could not say that Fleming was not a drug user.

{¶ 41} Fleming testified on his own behalf. He stated that he had access to the Flipp Royal account, but he had not used it, and three other individuals also had access to the account (identified on cross-examination as his two brothers and an ex-girlfriend). Fleming denied putting photos on the account or having pictures of him placed on the account.

{¶ 42} Addressing the events of April 15, 2020, Fleming stated that he had been driving to his mother's home when he was pulled over by the police. He denied that he had been going there with the intention of buying or selling drugs. Fleming testified that he had been a drug user since he was a juvenile, but he had been trying to "dial back on that" since his daughter was born, which was around the time the traffic stop occurred. He admitted to the officers that he was a drug user.

{¶ 43} On cross-examination, the State showed Fleming State's Exhibit 4, which began with some messages exchanged between Flipp Royal and Erin Murray, whom Fleming identified as the mother of his child. In those messages, Murray referred to Flipp

Royal as "baby." Fleming begrudgingly identified the other individuals who had access to the Flipp Royal account and said that Murray would not have referred to the other users as "baby."

{¶ 44} Fleming admitted that he had possessed methamphetamine and cocaine when he was stopped on April 15, 2020. He denied that he used the Flipp Royal account for drug trafficking. Fleming acknowledged, however, that he knew of Barclay and Leigh.

{¶ 45} In challenging his convictions on appeal, Fleming emphasizes that the Facebook messages were from March 2020 and were unlikely to refer to the drugs he possessed on April 15, 2020. He further notes that the amount of drugs found on him on April 15 was consistent with personal use. He thus argues that the State did not sufficiently connect the Facebook statements to the April 15 traffic stop to prove that the drugs found on April 15 were for sale.

{¶ 46} In this case, the evidence at trial demonstrated that Fleming had possessed methamphetamine and cocaine during an investigatory traffic stop on April 15, 2020. The officers and Fleming all agreed that Fleming was pulled over on April 15, 2020, and that drugs fell out of his pant leg while he was being searched. Laboratory analysis identified the suspected drugs as cocaine and methamphetamine. The officers testified that Fleming had claimed to possess the drugs for personal use, and Fleming admitted at trial to telling the officers that he was a drug user.

{¶ 47} To prove that Fleming was trafficking those drugs and not merely in possession of them, the State relied primarily on Facebook Messenger communications involving "Flipp Royal" and the testimony of Detective Allender. On appeal, the State

asserts that Detective Allender was able to identify Fleming as the owner of the Flipp Royal account, and that the Facebook text messages showed that Fleming regularly sold drugs, including methamphetamine and cocaine, in varying amounts, including small personal-use quantities. The State continues: "Defendant was found to be in possession of methamphetamine and cocaine during the traffic stop, and a reasonable jury could find that he was trafficking it based on the Facebook messages. * * * Defendant did not merely possess it for personal use, as the Facebook messages indicated he did not use or test drugs himself."

{¶ 48} We agree with the State that the jury could have reasonably concluded that Fleming sent Facebook Messenger texts under the profile name "Flipp Royal." Detective Allender was familiar with Fleming and recognized Fleming in the profile photographs on the Flipp Royal account. The birthday (month and day) on the account was the same as Fleming's birthday. Fleming acknowledged that he had access to the account, although he claimed not to use it. When pressed, Fleming identified his brothers and an ex-girlfriend as the other individuals with access to the account, and he indicated that the mother of his child, who had sent a message to Flipp Royal and referred to him as "baby," would not have used that term of endearment with the others. The evidence supported a reasonable conclusion that Fleming was the individual posting messages to the account.

{¶ 49} The Facebook Messenger texts, as interpreted by Detective Allender, consisted of communications where Flipp Royal/Fleming arranged to sell drugs to Barclay and Leigh in March 2020. On March 22, Barclay contacted Fleming about buying crack,

crystal meth, and heroin or fentanyl; Fleming made arrangements to sell drugs to Barclay and to bring the drugs to him.   Fleming and Leigh also exchanged text messages on several dates in late March where Leigh arranged to buy drugs from Fleming.   The State's exhibits clearly established that Fleming engaged in drug trafficking *in March 2020*, including the sale of small amounts of drugs, and that he met Barclay and Leigh at different locations to consummate the sales.

{¶ 50} The State further asserts that two statements in State's Exhibit 3 – Fleming's statement that someone else said the drugs were "fire" and his statement that Barclay said he had a "dude to test it" – demonstrated that Fleming was not a drug user. Detective Allender testified that the message that "they say it's fire" implied that Fleming depended on others to vouch for the quality of the drugs.   We disagree with the State's contention.

{¶ 51} Reading the text messages in context, it is apparent that Fleming purchased drugs from a supplier to sell to Barclay.   Fleming apparently relied on his "people's" statements concerning the quality of those drugs, and Barclay expressed a desire to have the drugs tested with his own expert.   None of the messages indicated whether Fleming was or was not a drug user generally, and although Detective Allender testified that he did not know Fleming to be a drug user, he also testified that he could not say that Fleming was not.   The jury could not have reasonably inferred, based on the State's evidence, that Fleming did not use drugs, particularly on April 15, 2020.

{¶ 52} Construing the evidence in the light most favorable to the State, as we are required to do with a sufficiency challenge, we cannot conclude that the State's evidence

was sufficient to support the jury's conclusion that Fleming engaged in drug trafficking on April 15, 2020. The State's evidence established that Fleming was in possession of a single baggie containing a small amount of drugs when he was pulled over by a Springfield police officer on April 15th. Nothing in the circumstances surrounding the April 15, 2020 incident suggested that Fleming was engaged in drug trafficking. There was no evidence that the police officers found money, drug packaging materials (such as baggies), scales, or any other items indicative of drug trafficking on Fleming's person or in the Equinox.

**{¶ 53}** The State's additional evidence, primarily in the form of the Facebook Messenger texts, established that, up to two weeks prior to date at issue, Fleming was actively engaged in drug trafficking. His drug marketing activities included the sale of methamphetamine and cocaine, even in small amounts, and that he would drive to different locations to complete the transactions. However, as acknowledged by Detective Allender, it was highly unlikely that the March 2020 messages related to the small amount of drugs in Fleming's possession on April 15, 2020, and the messages themselves reflected completed transactions with Barclay and Leigh. None of the Facebook Messenger communications concerned or even suggested a future sale of drugs on April 15. Furthermore, the Facebook Messenger texts did not indicate that Fleming engaged in specific conduct while engaged in drug trafficking (a modus operandi) such that Fleming's behavior on April 15 could be linked to his prior drug trafficking.

**{¶ 54}** The State's case boiled down to evidence that Fleming was a drug dealer, and because he was a drug dealer, he must have been trafficking the small amount of

drugs with which he was found on April 15, 2020. Indeed, in its closing argument, the prosecutor addressed the trafficking charges, saying:

> * * * One of the ways that a person can traffic drugs is to transport those drugs. But how do we know that he's going to sell them? We know that from his conversations in prior sales with known drug users and dealers within the City of Springfield. The defendant traffics and sells drugs. That's what he does, and that's what his Facebook messages show; and he can sit up there after hearing all of the testimony and tell you, "Well, I didn't send those messages" * * * but Detective Allender went through that 1,300 pages of Facebook records, and he saw that that account belongs to Jamal Fleming. * * * So it's my argument, ladies and gentleman, that the defendant was transporting these drugs to eventually prepare them for sale. Knowing that eventually he would sell them.

In her rebuttal closing argument, the prosecutor again stated that "those Facebook messages show that he had been ongoing engaging in trafficking behavior, and there is no reason to think that in a couple of weeks after these messages that that behavior had changed in any way." The prosecutor added that the messages showed he was not a drug user, because he did not personally attest to the quality of the drugs he sold.

{¶ 55} While it is *possible* that Fleming was transporting drugs on April 15, 2020, knowing that the drugs were intended for sale or resale by him or someone else, the jury could not have reasonably drawn the inference that Fleming *actually* was engaged in drug trafficking on April 15, 2020 based on the evidence before us. There was simply no

evidence to support a conclusion that, on April 15 specifically, Fleming was transporting the drugs at issue to traffic them. We therefore conclude that Fleming's convictions for trafficking in cocaine and aggravated trafficking in drugs (methamphetamine) were based on insufficient evidence. Accordingly, his fourth assignment of error is sustained.

{¶ 56} In light of our disposition of the fourth assignment of error, Fleming's first assignment of error (challenging the trial court's admission of the Facebook Messenger communications) and his second assignment of error (raising manifest weight of the evidence) are overruled as moot.

{¶ 57} Fleming has not challenged the jury's verdicts on the two counts related to possession of cocaine and aggravated possession of drugs (methamphetamine), and they are unaffected by our ruling on the trafficking offenses. Accordingly, the matter must be remanded for resentencing on those counts.

### V. Conclusion

{¶ 58} The trial court's judgment will be reversed, and the matter will be remanded for resentencing on possession of cocaine and aggravated possession of drugs (methamphetamine).

. . . . . . . . . . . .

DONOVAN, J. and LEWIS, J., concur.

Copies sent to:

Ian A. Richardson
Adam James Stout
Hon. Douglas M. Rastatter